UNITED STATES of America ex rel.
Louis WOLFISH et al., Petitioners,

v.

Edward LEVI et al., Respondents.

No. 75 Civ. 6000.

United States District Court,
S. D. New York.

Sept. 15, 1977.

As Amended Sept. 26, 1977.

William E. Hellerstein, Phylis Skloot Bamberger, Michael Young, Michael B. Mushlin, David J. Gottlieb, Amy Rothstein, John Boston, for The Legal Aid Society, Federal Defender Services Unit, New York City, for petitioners.

Robert B. Fiske, Jr., U. S. Atty. for the Southern Dist. of New York, New York City, for respondents; Louis G. Corsi, Frederick P. Schaffer, New York City, of counsel.

## OPINION

FRANKEL, District Judge.

In the explosively growing field of law about prison conditions lately developed in the federal courts, this case has one relatively rare feature: it concerns conditions in one of our own, *federal* places of confinement. The institution in question is the Metropolitan Correctional Center (MCC) adjoining this courthouse. The action was brought for the MCC's involuntary occupants (both male and female) as a class, embracing the pre-trial detainees for whom the facility was primarily designed, sentenced prisoners either awaiting assignment to a prison facility or assigned here to serve their (usually relatively short) terms, prisoners here on writs to testify or to stand trial, witnesses in protective custody, and persons incarcerated for contempt.[1] Initially brought and conducted largely or wholly by the first-named petitioner, who has since been assigned elsewhere, the case for petitioners was assigned by the court to the Federal Defender Services Unit of the Legal Aid Society, which has proceeded with a quality of resourceful and dauntless vigor for which the court records its appreciation.

The petitioners have lodged a long roster of complaints resting upon an array of constitutional and statutory theories. Some issues have been decided upon motions for summary judgment. Thus, upon affidavits recounting undisputed facts, supplemented by the court's physical views of the premises, the transformation of rooms designed for single occupancy into double rooms was held unlawful and enjoined. 428 F.Supp. 333 (Jan. 5, 1977). Along with that determination, the court invalidated (1) a rule allowing petitioners' receipt of literature directly from publishers and from substan-

tially no other source, (2) a practice of seizing property from inmates without giving receipts for it, and (3) the opening of inmates' outgoing mail. Id. Those determinations were accompanied by denials of petitioners' complaints regarding inspection of non-legal mail.

At earlier times, upon applications for interlocutory relief, the court issued preliminary injunctions relating to the MCC's telephone service and forbidding any change in visiting hours without notice to the court and petitioners.

Trial of the many questions still to be decided began on February 28 and extended, with some interruptions and truncated days, through March 30, 1977. In addition to the live testimony of inmates, attorneys, correctional personnel (including the Warden and Bureau of Prisons Director), and various experts, the court has considered deposition testimony, voluminous exhibits, and the observations made in two further visits to the MCC. These materials, as compounded and alchemized in post-trial memoranda and affidavits approaching a total of 1,000 pages, generate the findings and conclusions that follow.

In advance of enumerating what the court has decided, and why, it has seemed convenient to begin with a general description of the MCC, and then to sketch preliminarily the principles and restrictions (by no means fixed and certain) governing the involvement of federal judges in the conditions and management of federal prison facilities. Against these background observations, the facts and dispositions with respect to each subject of controversy will be the subject of our third, and lengthiest, chapter.

## I.

The MCC, which opened on August 2, 1975, has an appearance, and results from a course of planning, markedly divergent from the bestial traditions of the American

---

1. The propriety of continuing the case as a class action was confirmed by an order dated December 23, 1975, in which the class was defined as "all persons detained in the Metropolitan Correctional Facility."

jail.[2] However well or ill they succeeded, a question we must presently address, those who conceived and designed this institution strove to be humane. They undertook to plan not merely for security and efficiency, but for modest amenities that might rescue from the wretchedness of incarceration some remnants of privacy, self respect, and, even, dignity. The MCC, at least upon first sight, is markedly different from the familiar pattern of barred cages, gray corridors, and clanging gates comprising the standard image.

Two features of the institution have basic significance for its structural character and some of the major complaints lodged by petitioners. First, built in a congested part of a congested City, next to our court building, it is 12 stories tall and has no open ground around it for recreational or other uses. Second, the five floors of the building housing inmates are divided into "functional," or "modular," units reflecting a carefully conceived idea of how best to organize relatively complete programs within subdivisions of the building rather than requiring or permitting aggregations of the population for such activities as meals and recreation. The modular unit, as its creator imagined it, would facilitate useful classifications of inmates (e. g., sentenced people, those awaiting trial, dangerous/nondangerous). Each functional unit, being self-contained, would include its own common area, eating place, some recreational facilities, and separate sleeping quarters. Since the total number within the unit would be relatively small, problems of mass traffic would be cut or eliminated. Long periods of lock-in time would become unnecessary. Inmates could circulate within the unit during much of the day, moving freely from the common area to the comparative privacy of a dormitory or the more nearly entire privacy of the single room, which was to be the most prevalent form of sleeping accommodation.

This design was implemented. As the MCC came to be constructed, almost every floor housing inmates has two modular units.[3] Each unit has from two to six "clusters" or corridors of rooms or dormitories radiating from a central common area. One of the units contains dormitories, designed by the planners to house ten inmates each. The remaining units contain clusters of rooms, each designed for a single occupant, each originally equipped with its own key to be given to the inmate.[4] Except for a unit now housing female inmates, each of the rooms has a washbasin and toilet.

The common areas are carpeted, and other details are designed to supply some color and interest for the eye. These areas, except for the one in the protective custody unit, are two stories in height, with flights of stairs leading to the rooms or dormitories. Each common area has a color television set, couches, chairs, tables, telephones,

---

**2.** American jails, which characteristically, if ironically, house minor offenders and presumptively innocent people awaiting trial under conditions far more wretched than those of the prisons, have generated shelves of depressing literature. See, e. g., K. Menninger, *The Crime of Punishment* (1966); B. Bagdikian, *The Shame of the Prisons* (1972); *Inmates of Suffolk County Jail v. Eisenstadt*, 360 F.Supp. 676 (D.Mass.1971), aff'd, 494 F.2d 1196 (1st Cir.), cert. denied *sub nom. Hall v. Inmates of Suffolk County Jail*, 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 189 (1974); *Rhem v. Malcolm*, 371 F.Supp. 594 (S.D.N.Y.), aff'd, 507 F.2d 333 (2d Cir. 1974).

**3.** The two exceptions are an honor unit, the only one on the second floor, and Unit 3, on the third floor. The honor unit houses the "cadre," sentenced inmates serving their terms at the MCC, who work throughout the institution and are rarely locked into their rooms. These inmates are housed in rooms originally intended as part of the infirmary. Unit 3 is the protective custody unit.

**4.** The word "design" is—or is readily capable of being made—ambiguous. As used herein, it means "intended" by the planners of the structure, not merely as an abstract idea, but in terms of concrete effectuation (and, often, public assurances to other agencies or branches of government). Thus, a room planned for single occupancy was built (and equipped) with a single bed, storage and movement space suitable for one, lighting and ventilating equipment similarly arranged, etc. See 428 F.Supp. at 335–340, where the conversion of these single rooms to doubles was held by this court to have been unlawful.

mail boxes, exercise apparatus, one or more typewriters, laundry facilities, a water fountain, an education area, and pantries with microwave ovens. There is equipment for closed-circuit educational TV, said at the time of the court's last visit to be verging toward employment. There are staff offices within the units (other than the protective custody unit). Carrying out the functional design, meals are brought on carts to the units, having been pre-cooked and apportioned onto trays, and reheated in the microwave ovens before being served and consumed within the unit.

Avoiding the bar or cage motif, the designers and builders of the MCC arranged narrow, but unbarred, windows facing the outside world, made of a powerful ⅜-inch thick unbreakable polycarbonate plastic, which is colorless and transparent.[5] The windows are recessed some 14 inches from the building's face and are soundproof.

Since the units are designed and used to accommodate nearly all the regular aspects of life in confinement, there is little or no reason in respondents' view, or opportunity, for an inmate's departure from the confines of the unit during the days and nights of his or her stay. Many inmates actually stay within their units continuously for long stretches of days or weeks. There is no gymnasium, chapel, commissary, or industrial work place. There is a rooftop recreation area equipped with an abbreviated basketball court, and for paddleball, handball, or open-air spectatorship. The area is surrounded by a wall 20 feet high and topped by a mesh of stainless steel wires welded to a steel gridwork. The inmates, proceeding by units, are allowed about an hour a day in this rooftop area, the desirability of which varies, of course, with weather conditions, and they vary widely in their uses of this opportunity. For the overwhelming majority of inmates, these excursions, the sick call, attorney visits, and court appearances are the only times they leave their units.

Other aspects of the functional-unit plan —touching, *inter alia*, visiting, religious activities, and library facilities—are best discussed in connection with specific issues to be decided.

## II.

General propositions may not decide, but they define some useful perimeters for, concrete issues like those the petitioners have raised. In any case, the court has found it convenient to take some rough bearings before proceeding to the asserted grievances one by one.

We work in a new, but already substantial, field of law elaborated mostly by federal courts responding to demands of *state* prisoners for rights under the Federal Constitution and federal laws said to be offended by their treatment in state prisons. A host of cases have marked by now an array of rights to minimal decency in jails and prisons—some rights of expression and religious observance; rights to moderately civilized living quarters, food, and medical care; rights to escape punishment either barbaric in character or arbitrarily imposed; rights even to a measure of privacy and personal integrity, among others. Without exhausting them here, the federal charter of prisoners rights has featured prominently the First, Eighth, and Fourteenth Amendments, commonly marshalled against state defendants under the aegis of 42 U.S.C. § 1983.

There is little if any quarrel in the scholarly briefs before us that the federal rights given to state prisoners are not greater than those of federal prisoners. A question still surprisingly open is whether a federal court, confronted by demands for fair treatment from "its own" inmates, may not in such a case shoulder greater responsibilities or, to put it less demurely, exercise greater powers. We send them there, after all. Bernard Shaw was probably right for his time when he said:

"Judges spend their lives in consigning their fellow creatures to prison; and when some whisper reaches them that

---

5. As a result of an escape attempt, bars have been placed on some of the windows, and steel sheathing has been placed on the inside of certain rooms with exterior walls.

prisons are horribly cruel and destructive places, and that no creature fit to live should be sent there, they only remark calmly that prisons are not meant to be comfortable; which is no doubt the consideration that reconciled Pontius Pilate to the practice of crucifixion.[6]

But that is no longer the position when state prisoners come to federal court. It may outrun precedent to say prisoners are "wards of the court."[7] Still, the notion that judges may ignore people after they are confined is no longer valid.[8] And it may be uniquely unacceptable for federal judges dealing with federal prisoners after all that has happened lately to state prisons in the federal courts. As the point has been put negatively, "where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities." *Procunier v. Martinez*, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). It is at least implicit that our duties are less constricted with respect to federal prisoners.

Beyond such general propositions, there are pointed and specific reasons justifying closer scrutiny of federal prison conditions by federal judges. Without reaching questions of constitutional law, we find in the statute books a matrix of federal law in which our Bureau of Prisons functions. These statutes extend comprehensive *powers* of management, control, and supervision over federal prisons and prisoners, see 18 U.S.C. §§ 4001(b), 4042, 4081, and 4082, and the powers are given to administrative officials, not judges. At the same time, by no means uniquely, the powers import *duties*,

see 18 U.S.C. §§ 4042 and 4081, and these obligations (to take care, protect, classify, provide suitable quarters, and instruct) are not misconceived or distorted if we describe them as intended to "benefit" those locked up under federal authority. It is no long step from that to infer that some rights—at least against arbitrary, capricious, or unauthorized treatment—accrue to the prisoners for whose management the statutes were written. Cf. *J. I. Case v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964).

Further grounds for thinking the federal judicial power (and responsibility) broader for federal than for state prisons may be found in the Administrative Procedure Act. When state officials, judicial or other, chafe against federal intrusions, their own provisions for reviewing administrative action offer wide avenues for recapturing leadership and control in their own domains.[9] It was never decreed, after all, that the bare floor of federal constitutional prohibitions must become for the States a ceiling above which humane and creative ordering, even for prisoners, should not be conceived.[10]

■ By a parity of reasoning, the *statutory* powers of the federal courts to draw lines against arbitrariness, caprice, and irrationality would seem to be available in appropriate cases where actions or practices of the Bureau of Prisons are called into question.[11] The subject seems still to be surprisingly open. There is some spare and divergent authority on the applicability of the APA to the Bureau of Prisons. Compare *Ramer v. Saxbe*, 173 U.S.App.D.C. 83, 85, 522 F.2d 695, 697 (1975), with *Clardy v. Levi*, 545 F.2d 1241 (9th Cir. 1976); see also

**6.** "The Crime of Imprisonment," preface to S.& B. Webb, *English Prisons under Local Government* (1922), quoted in Note, *Beyond the Ken of the Courts*, 72 Yale L.J. 506, 558 (1963).

**7.** See Singer, *Prisoners as Wards of the Courts—A Nonconstitutional Path to Assure Correctional Reform by the Courts*, 41 U.Cinn. L.Rev. 769 (1972).

**8.** This may be one of several subjects on which we could learn from foreign counterparts. Judges in France, West Germany, and Italy, perhaps elsewhere, are charged with supervision over conditions of confinement, claims of maltreatment, aspects of parole, and related matters of penal administration.

**9.** See Comment, *A Statutory Right to Treatment for Prisoners*, 50 Nebraska L.Rev. 543 (1971).

**10.** Cf. Paulsen, *State Constitutions, State Courts, and First Amendment Freedoms*, 4 Vanderbilt L.Rev. 620 (1951).

**11.** Cf. Spaeth, *The Court's Responsibility for Prison Reform*, 16 Villanova L.Rev. 1031, 1041–46 (1971).

*Mercer v. United States Medical Center for Federal Prisoners,* 312 F.Supp. 1077, 1079–80 (W.D.Mo.1970). Some courts have reviewed actions of prison officials under an "arbitrary and capricious" or "abuse of discretion" standard without specifically indicating the derivation of the standard. See, e. g., *Marchesani v. McCune,* 531 F.2d 459, 462 (10th Cir.), cert. denied, 429 U.S. 846, 97 S.Ct. 127, 50 L.Ed.2d 117 (1976); *Royal v. Clark,* 447 F.2d 501, 502 (5th Cir. 1971). Without presuming to synthesize definitively the wisps of uncertain doctrine, and without considering "applicability" as a universal concept (since the APA may, of course, apply in some respects and not in others), but having firmly in mind the basic premise that "judicial review * * * will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress," *Abbott Laboratories v. Gardner,* 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967), this court has concluded that at least some actions of the Bureau of Prisons are neither "committed to agency discretion" nor shielded by any "statutes [which] preclude judicial review," 5 U.S.C. § 701, so that there is some scope for judicial duty and authority under the APA.

On the latter aspect, little need be said. There simply is no statute precluding judicial review.

The prior criterion—whether the subject is "committed to agency discretion"—is a harder topic. It was customary until lately for the judges to stay strictly away from issues as to prison administration. See *Procunier v. Martinez,* 416 U.S. 396, 404, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). That stance has changed radically in the last decade or so. It remains true that the judges are not to take over the running of the prisons, being notably "ill equipped" as well as unauthorized to do that. Id. at 405, 94 S.Ct. 1800; and see *Meachum v. Fano,* 427 U.S. 215, 228–229, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). Still, the notion of pris-

on administrators as absolute sovereigns is quite dead. And that is as it should be. There are powerful reasons, after all, why the judges ought to be prepared to give at least some attention to complaints against the conditions of confinement ordered by judges. There is commonly as a practical matter no other forum in which prisoners can be heard. They have no clout with legislators, other elected officials, or anyone in the responsible agency. See *Davis Associates v. Sec. of HUD,* 498 F.2d 385, 390 (1st Cir. 1974). Despite the traditional reverence we have paid to the expertise of jail keepers, there are, as the present record reveals, many pertinent matters on which their knowledge seems no more profound than that of judges. And experience has taught us now that judicial intervention may be meaningful, effective, and beneficial, without also being unnecessarily intrusive. There are, in sum, at least several factors of consequence rendering it unacceptable to hold across the board that prison officials' actions, policies, and procedures are unreviewably committed to their discretion.[12]

Whatever may come to be the scope of statutory review of actions by prison officials, there are clear grounds of familiar judicial policy favoring that mode over constitutional adjudications. To be sure, this is an area, like many others, where conceptions of due process are "not graven in stone." *Wolff v. McDonnell,* 418 U.S. 539, 572, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Times and circumstances change; "a reasonable accommodation" at some point in constitutional terms may come at some later time to be unreasonable and unacceptable. Id. So there is flexibility in any event. But that desired quality and maximum participation by all those charged with governing, is more readily achieved when sound judicial decisions are possible without resort to the Constitution. Legislative and executive responses—especially on matters like prisons, where the primary authority and concern are indeed for legisla-

---

12. See generally, Saferstein, *Nonreviewability: A Functional Analysis of "Committed to Agency Discretion,"* 82 Harv.L.Rev. 367 (1968).

tive and executive officials, *Procunier v. Martinez, supra,* 416 U.S. at 404–405, 94 S.Ct. 1800; see also *Meachum v. Fano, supra,* 427 U.S. at 2288–29, 96 S.Ct. 2532—are more easily given, and may be paid more entire deference, when the adjustments and balancing of interests are accomplished in terms less portentous than the Constitution's. Upon premises such as these, this court has undertaken, with respect to each of the several issues, to consider possible non-constitutional grounds as well as (in fact, prior to) the constitutional theories mainly debated in the briefs.

It may be, of course, that the difference becomes more subtle and refined than is useful. What is "arbitrary," "capricious," "irrational," or "unreasonable," may at once, and indistinguishably, violate constitutional as well as statutory rights.[13] It may be enough for most purposes, without too much refinement, to accept as a usual test the Government's shortly stated standard of "whether the institution is providing reasonable and decent conditions of confinement * * *."[14] We are commissioned, however, to be explicit and candid, and to conform to the law. The effort has been, therefore, to identify the grounds of decision with a measure of specificity.

Whatever the grounds, whether constitutional or statutory, the case has been approached with three basic principles in view. These bear restatement:

■ *First,* deference is owed to the primary authority and expertise of those charged with building and running the prisons. Their judgments, unless made arbitrarily or in conflict with particular rights given by Constitution or statute, are entitled to respect and probable finality. See, e. g., *Jones v. North Carolina Prisoners' Labor Union, Inc.,* —— U.S. ——, ——, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977).

■ *Second,* it remains nevertheless a powerful principle that a prisoner retains "all the rights of an ordinary citizen except those expressly, or by necessary implication,

taken from him by law. While the law does take his liberty and imposes a duty of servitude and observance of discipline for his regulation and that of other prisoners, it does not deny his right to personal security against unlawful invasions." *Coffin v. Reichard,* 143 F.2d 443, 445 (6th Cir. 1944). Defining the rights thus retained—and balancing them against problems of security, good order, and the supposed purposes of punishment—is now an accepted, if not uniformly simple, task of the judiciary.

■ *Third,* pre-trial detainees, a central group in the petitioner class, are not subject to the substantial powers of prison officials that attend their function of administering punishment. For these detainees, presumed to be innocent and held only to ensure their presence at trial, "any deprivation or restriction of * * * rights beyond those which are necessary for confinement alone, must be justified by a compelling necessity." *Detainees of Brooklyn House of Detention v. Malcolm,* 520 F.2d 392, 397 (2d Cir. 1975); see also *Rhem v. Malcolm,* 507 F.2d 333, 336–37 (2d Cir. 1974).

With these thoughts in view, we proceed to the list of issues and their determination.

## III.

### A. MODULAR CONFINEMENT

As described earlier, the MCC is organized into self-contained living units. With the exception of medical services and recreation on the rooftop area, the institution provides all services to the inmates on the living unit.

This "modular unit" is an interesting, well-intended, in some ways beneficial, but in some ways uniquely restrictive and hotly contested mode of confinement. The combination of common areas with radiating clusters of sleeping quarters is at first—and, indeed, steadily—more pleasing to the eye than the traditional corridors of cell

---

**13.** But see Linde, *Due Process in Lawmaking,* 55 Nebraska L.Rev. 197, 225–235 (1976).

**14.** Respondents' Post-Trial Memorandum 56.

blocks or dormitories. On the other hand, the narrow perimeter measurements of the unit as a whole soon become oppressive and close when, as is usually the case, they bound the inmate's world for 23 or 24 hours of the day. There is no room to run or jog or even walk very much. There is no place to go outside the unit—or, at least, no place where it is permissible to go.

In this important respect, the units contrast sharply with more familiar styles of prison architecture. In many other jails, and in many secure prison facilities for sentenced inmates, the people in confinement can move freely over relatively long distances and in relatively large spaces. Within the perimeter walls of a Danbury or a Lewisburg, for example, there are hundreds of yards of walking and running distance both in recreational areas and in the corridors or open spaces leading from one to another of the places to which prisoners are expected and permitted to go. Movements of this nature are more or less random within the prescribed time spans, so that there is a modest but noticeable measure of choice and autonomy. During designated periods, confined people may proceed to work places, dining halls, commissaries, libraries, auditoriums, chapels, school rooms, gymnasiums, playing fields, and other varied destinations. Many of these goings and comings are matters of individual choice. They may be accomplished individually or in random, self-selected groups rather than formations proceeding under guard.

Analyzing the far more straitened confines of the MCC, experts for petitioners condemned it as a harsh and unacceptable form of "maximum security" imprisonment. Respondents' experts, who described as "maximum security" institutions those where inmates are locked into their rooms for 23 hours a day, or where inmates are separated from the guards by bars, considered MCC to be "medium custody." There is no dispute, however, that movement is more restricted at the MCC than in most other federal facilities. Nor are we likely to proceed far in resolving specific issues by conjuring with categories like "maximum" and "medium."

A corollary of the modular living system is the lack of central facilities which inmates may visit to engage in certain activities—an indoor gymnasium, chapel, law library, general library, or commissary. Also, keeping inmates confined to their living units restricts employment and educational program opportunities. Petitioners request that the court order sweeping changes in the modular living system, including directions to develop central facilities such as those listed.

In studying the several issues thus raised, the court has confronted two that have pervasive significance: the classification of inmates and the length of time people are confined at the MCC. Because their resolution affects a train of other matters, these problems are treated first, followed by others more or less in the order of the briefs.

1. *Classification.*—A relatively small number of MCC inmates are free of the most restrictive aspects of modular confinement. These are cadre personnel, often called "redstripers" for an identification symbol they wear, who are free to pass through the doors separating units and move about through the areas within the outside perimeter of the Center. For most of the others, however, the situation of substantially total confinement is maintained without any attempted distinctions among the obvious categories into which the inmates fall. This virtually complete failure to classify is defended on the ground that people stay for only brief periods in the MCC and that effective determinations as to their characteristics are thus rendered difficult or impossible. Further, respondents point out, they do not have pre-sentence reports on pre-trial detainees and thus lack a ready source of information on which to base classifications. It may be as difficult as respondents say to classify MCC inmates, though this is not established to the court's satisfaction. The claim of impossibility is totally untenable.

■ The failure to distinguish among inmates leads to a grossly excessive use of substantially total confinement when some

lesser level of restriction would be entirely feasible in a great many cases. *Rhem v. Malcolm*, 507 F.2d 333, 338 (2d Cir. 1974), aff'g 371 F.Supp. 594 (S.D.N.Y.1974). While the court has been asked to order sweeping changes in the physical arrangements for modular confinement, it seems imprudent to go so far. Instead, the court will direct a reasonable system of classification, allowing the respondents themselves, in the exercise of their main responsibilities, to proceed from that to a more acceptable level of confinement for at least a large number of those held in the MCC.

There is no rational excuse for holding elderly, lame, sickly, and otherwise incapacitated persons as tightly as may seem necessary for those more agile and disposed to take measures. Similarly, it is unacceptable to lump without discrimination the embezzler, the bank robber, the mail thief, the narcotics dealer, and every miscellaneous category of alleged criminal, and treat all alike for purposes of security. Not least of all, it is impermissible to treat indistinguishably those who are presumably innocent and awaiting trial, and those who have been convicted and are serving sentences.

The failure to classify, with its consequences of excessive and indiscriminate confinement, is rationally unsupportable, and correctable for that reason alone. It is also, as the cases show, a denial of due process. Building upon the common sense of the situation, as vindicated by ample precedents and nowhere refuted by respondents' submissions, the court will order, first, that respondents must separate pretrial detainees from sentenced inmates. *Barnes v. Gov't of the Virgin Islands*, 415 F.Supp. 1218, 1235 (D.V.I.1976); *Holland v. Donelan*, Civil Action No. 71–1442 (E.D.La. 1973); *Hamilton v. Landrieu*, 351 F.Supp. 549, 552 (E.D.La.1972); *Taylor v. Sterrett*, 344 F.Supp. 411, 423 (N.D.Tex.1972), aff'd in part, rev'd in part, 499 F.2d 367 (5th Cir. 1974), cert. denied, 420 U.S. 983, 95 S.Ct. 1414, 43 L.Ed.2d 665, reh. denied, 421 U.S.

971, 95 S.Ct. 1969, 44 L.Ed.2d 463 (1975); *Brenneman v. Madigan*, 343 F.Supp. 128, 138–140 (N.D.Cal.1972); *Hamilton v. Love*, 328 F.Supp. 1182, 1191 (E.D.Ark.1971); *Jones v. Wittenberg*, 330 F.Supp. 707, 717 (N.D.Ohio 1971), aff'd *sub. nom. Jones v. Metzger*, 456 F.2d 854 (6th Cir. 1972).

■ Secondly, respondents must separately classify persons who pose physical dangers, who are thought on plausible grounds to pose risks of violence, of escape, or attempts to escape. *Rhem v. Malcolm*, 371 F.Supp. 594, 624–25 (S.D.N.Y.), aff'd, 507 F.2d 333 (2d Cir. 1974). See also *Obadele v. McAdory*, Civ. No. 72J–103 (N)(S.D. Miss. June 19, 1973); *Taylor v. Sterrett*, *supra*, 344 F.Supp. at 423; *Brenneman v. Madigan*, *supra*, 343 F.Supp. at 140. This is not only appropriate for the general security of the institution; it is also a means of implementing the rights of the inmates themselves to be protected from physical and mental injury. *Gates v. Collier*, 501 F.2d 1291, 1308–09 (5th Cir. 1974); *Martinez Rodriguez v. Jimenez*, 409 F.Supp. 582, 594 (D.P.R.1976), aff'd, 551 F.2d 877 (1st Cir. 1977); *Pugh v. Locke*, 406 F.Supp. 318, 329, 333 (M.D.Ala.1976); *Alberti v. Sheriff of Harris County Texas*, 406 F.Supp. 649, 669 (S.D.Tex.1975); *Rhem v. Malcolm*, *supra*, 371 F.Supp. at 628–29; *Incarcerated Men of Allen County v. Fair*, Civil No. C 72–188 (N.D.Ohio, May 19, 1973). As the court said in the last of these cases:

"[A] jail should be a very safe place to be. Prisoners have a right to safety, and failure to provide maximum possible safety because of administrative or mechanical problems cannot be justified." Opinion at 3.

It is unacceptable, for example, to house in dormitories inmates who, on reasonable grounds, must be deemed to present threats to those with whom they live.[15]

---

15. Petitioners demand that they be placed in dormitories only with their consent. In view of the ruling now on classification and the determination below as to length of stay, the court

denies this further form of proposed relief. There is no need to decide whether a total prohibition against dormitory living might in some circumstances be required.

When the foregoing measures of classification have been instituted, perhaps along with others that respondents are, of course, free to evolve, it should be feasible to relax the existing restrictions on movement within the outer borders (which are highly secure) of the MCC. As has been noted, the court is unable and unwilling to prescribe such further measures of relief at this time. It is to be hoped that respondents will deal creatively and sufficiently with the problem. The issues that may yet arise on this score are postponed for another day.

2. *Length of confinement.*—It has become clear—it could perhaps have been said *a priori*—that disputed conditions which may be reasonably tolerable for relatively short terms become progressively more cruel or injurious with the lapse of time. The point is underscored by respondents. Throughout their arguments—on exercise, recreation, work, and other aspects of MCC life—they emphasize that this is a short-term institution. The argument is significant. And it has significant implications.

Respondents stress that over 50% of the inmates spend less than 30 days in the MCC and 73% less than 60 days. Petitioners stress the still substantial number comprising the other 25%. Since the law values each of us one at a time, this large group of human beings must be reckoned with. So it is important to deal with the evidence that 7.5% are confined in the MCC for 60–90 days; 4.5% for three to four months; 8% for four to six months; and so on, with some inmates, mostly those in protective custody, residing at MCC for as long as 620 days.[16]

The total record on the pertinent subjects demonstrates in the end that the modular arrangements in the MCC will do on the whole for as long as 60 days, but not for longer. This is obviously not a figure computed with calipers. It is, however, a considered judgment based on the totality of the relevant circumstances—such things as the lack of a gymnasium, the lack of outdoor space for walking and running, the absence of a chapel, auditorium, library, separate work places, separate school and classrooms, and other facilities. Appraising these aspects in light of the testimony and direct observation, the court has been led to conclude that the MCC grows unacceptably cramped and oppressive for most healthy adults after a sojourn of two months. Some, of course, may find it tolerable, even preferable, for longer. Some may suffer— to an extent that may come later to be separately adjudicated—after much shorter times. But the record is preponderantly supportive of the view that the majority of inmates may fairly be subjected to the modular arrangement for 60 days, and that they are likely thereafter to suffer unduly in terms of close, constricting, tense, and frustrating confinement. See *Rhem v. Malcolm,* 432 F.Supp. 769, 789 (S.D.N.Y.1977), and cases there cited.

Upon these findings, and having in mind the purpose and stated rationale of the Center and its design, the court concludes that confinement for over 60 days, except for volunteers, should not be tolerated. It is an arbitrary and capricious deviation from the intended and promised use of the facility. It is, if the point need be reached, a denial of due process. There is no reasonable or rational basis for perverting a facility built and justified for brief periods of detention into a long-term prison. The court will, therefore, order that no inmate be kept in the MCC for a period longer than 60 days without his or her consent. As soon as it is known that an inmate's stay will exceed 60 days (a prospect that may be obvious from the outset or only become obvious after the passage of some time), that inmate will be informed of his or her right to be transferred to another institution. The right may be waived. Inmates may well prefer the MCC, for its proximity to home or other advantages, despite its defects. See *Rhem v. Malcolm, supra,* 432 F.Supp. at 789. But

---

**16.** These figures (rounded off) are taken from a survey done by respondents. Petitioners argue that it underrepresents the number of inmates who stay for long periods of time. Petitioners would also add successive sojourns at the MCC to determine an inmate's length of stay. In view of the court's ruling, it is unnecessary to resolve the argument in precise detail.

the right of transfer, along with the privilege of waiver, must be made known promptly in clear and non-coercive terms.

As will appear further, several of the rulings on other issues rest in part on this premise of relatively short stays in the MCC.

3. *Physical Exercise.*—There is no indoor gymnasium at the MCC. Physical exercise is available one hour each day on the rooftop area, weather permitting. There are weight machines, exercise bicycles, dip bars, jogging machines, wall pulleys, and medicine balls variously available in the multipurpose areas of the units, though not all of these things are on all units.

Petitioners challenge respondents' assertion that inmates have access to the rooftop daily. They point to the vagaries of weather in New York City. They complain further that the hours assigned to each unit frequently coincide with that unit's visiting hours; that the elevator is at times inadequate to transport expeditiously all inmates who wish to use the roof; that the guards do not make enough of an effort to let inmates know when the roof is open. Finally, petitioners point out that on several occasions over the past year, roof usage has been cancelled because of staff shortages.

The court finds, however, that the rooftop area is effectively available to the inmates for one hour per day at almost all times when the weather leaves it usable. The assigned hours are posted, and inmates can arrange to be ready for the assigned periods. Coordination with visits is perfectly feasible; respondents must deal, like everyone, with the limits of the day. On our tours, the roof area was well populated by inmates engaged in a variety of activities.

For those days when the weather does not permit outdoor activity, there is sufficient apparatus on the units to provide exercise. Although the use of this equipment sometimes results in noise that is less than ideal for TV listeners, the annoyance is modest and manageable with minimal effort by the inmates themselves to accommodate each other's needs.

■ A gymnasium, originally part of the MCC design, would be highly desirable. If the court were permitting involuntary sojourns of over 60 days, some facility of that nature might be claimed more effectively to be a requirement enforceable under the Constitution or relevant statutes. But the enforcement of the original purpose to use the MCC only for short terms obviates that possibility. The court concludes that the provisions for physical exercise, in the setting of this decision as a whole, are sufficient.

4. *Religious activities and observances.*—The MCC provides religious services for Catholics, Protestants, Jews, Muslims, and Christian Scientists. There is, however, no central chapel. Religious services are led by clergy of the various faiths who make the rounds of the institution. Because the inmates may not leave their units, the clergy must divide their time among them and are unable to provide very extensive services or counseling. Several of them have offices in the MCC, but the inmates are not allowed to leave their units to visit them.

The modular restrictions result in a series of complaints. Jewish inmates, scattered among the units, are often unable to assemble a *minyan* (ten adult males) required for organized worship. A Muslim inmate complained that he did not participate in services because the Imam was of a sect different from his. Protestant and Catholic inmates protested the brevity of the time their clergymen have for them. More broadly, petitioners urge that respondents be required to "provide an adequately equipped chapel at the MCC to which petitioners may go for religious services;" additionally, that inmates should be allowed to visit the clergymen's offices; and that respondents should provide "sufficient numbers of adequate and qualified clergy of the same major faiths as petitioners."

■ It is obvious that conditions for religious observance at the MCC are not ideal. It would be preferable were there a chapel or other arrangements for inmates of the same faith to congregate. It is to be hoped, moreover, when classification procedures

begin and overcrowding is mitigated, that respondents will find it workable to allow assembly of people from the various units for more effective and less cursory services. But whether or not that hope is realized, the court finds no grounds for ordering any of the relief thus far discussed under this heading. Again, for the short terms hereafter to be the rule, the deprivations must be tolerated, as they are in other exigencies both civilian and military, on land and at sea, that occur and recur in our community's modes of existence.

█ In one respect, however, respondents are shown to be paying less respect than the Constitution commands to the religious needs of MCC inmates. Muslim observers, like religious Jews, must eschew pork. Jewish inmates obedient to this requirement are given kosher meals since our Circuit ordered support of this dietary restriction. *Kahane v. Carlson*, 527 F.2d 492 (2d Cir. 1975). The simplest, if not a compulsory, expedient would be to give the same meals to observant Muslims. Instead, respondents have professed to prefer for the latter an arrangement in which pork is deleted from the Muslim meal tray and an extra helping of potatoes or some other vegetable is substituted. The arrangement is a failure. The substitution is wrong in nutritional principle; it fails to supply comparable nourishment. Moreover, even this inadequate arrangement is often neglected, and the observant Muslim is made simply to do without the meat portion or any replacement of any kind.

In this setting, the discrimination between Muslims and Jews, certainly not sought by either group, becomes a wrong to be remedied. Respondents have suggested no reason whatever for allowing it to continue. "In a case where a [practice] has been opposed on grounds as substantial as those presented here, the [agency] has the burden of offering *some* reasoned explanation." *Assoc. Indus. of N.Y.S., Inc. v. United States Dept. of Labor*, 487 F.2d 342, 354 (2d Cir. 1973). Respondents make no pretense of meeting this minimal test.

The court will order, therefore, that observant Muslims be served pork-free meals the same as those given to observant Jews, or allowed in substantially identical fashion to satisfy both their nutritional and their religious entitlements. The court leaves open to this extent the exact mode of compliance. See *Kahane v. Carlson, supra*, at 496. The critical point of the decree is that the rights be respected and that the existing course of arbitrary and unjustified discrimination be ended.

5. *Law Library.*—The MCC maintains a law library that functions primarily as a lending library. Only members of the cadre are permitted to visit the library. All other inmates must request books as they need them, giving specific citations. Request slips are placed in envelopes on bulletin boards of each unit. The slips are picked up daily, Monday through Friday, and, within a day or two, the books are sent to the inmates. Three books may be requested at a time; they may be retained for a maximum of three days, but the time limit is often relaxed.

The librarian, a disbarred attorney serving a sentence at the time of our trial, is prohibited from engaging in any research. While this restriction is sometimes disregarded, the librarian never functions effectively as a legal researcher on more than trivial questions.

█ A list of library materials and rules is provided to inmates. The list was found, however, to be seriously incomplete. A considerable amount of material actually in the library is not on the list, an omission that is specially hurtful in an arrangement that denies library users access to the shelves and the physical collections. This lack of access is the most serious and decisive respect in which the library facility must be deemed inadequate. Writing for the small and selected readership of the Federal Supplement, the court need not labor the point that effective legal research is impossible where it must be attempted at a remote distance from the volumes, with hopeful stabs at three books at a time spaced over intervals of two days or so.

While petitioners also complain of other things, including the insufficiency of the collection, this problem of non-access presents an overriding concern in the circumstances of the case before us.

Drawing a long bow, as always, petitioners demand that there be "a fully equipped up-to-date law library" with access at all times other than hours of lock-in. They contend also that the prohibition against possession of personal typewriters impairs efforts at self-representation; that the institution must provide typewriters for those who need but do not have them; and that facilities for duplicating papers are not, but should be, available to them.

The basic propositions from which the course of decision may proceed are these:

First, all of the inmates must have "adequate, effective, and meaningful" means of access to the courts. *Bounds v. Smith,* 430 U.S. 817, 822, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977).

Second, all of them, if they are so minded, may represent themselves. *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); *Price v. Johnston,* 334 U.S. 266, 284–85, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948); *Adams v. U.S. ex rel. McCann,* 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268 (1942).

When we apply these principles to the case at hand, it becomes evident that a number far smaller than the total MCC population is meaningfully affected by the library issue. The inmates awaiting trial, the primary class for which the facility was built, are overwhelmingly represented by counsel. For them, the complaints about the library are not significant.

Most prisoners here on writs and most of those serving the characteristically short sentences involved when the MCC is made the place of confinement are not engaged in *pro se* litigation.

Finally, the problem for all should be alleviated by the limitation to 60 days of most sojourns at the MCC.

There remains, nevertheless, the small number exercising their right to represent themselves. For these, as has been noted, the existing long-distance, slow-moving, lending library system now in effect must be replaced. Contrary to respondents' contentions, this conclusion has support in precedent as well as in realities familiar to our profession. E. g., *Nadeau v. Helgemoe,* 423 F.Supp. 1250, 1272–73 (D.N.H.1976); *Kirby v. Blackledge,* 530 F.2d 583, 586 (4th Cir. 1976). Inmates entitled to a library facility have a right to physical access to the shelves during a reasonable period of each day.

The implementation of this right should appropriately be left in the first instance for discretionary selection among possible options by the prison authorities. The highrise urban institution presents both opportunities and difficulties. The MCC is a short walk or ride from some of the most ample law libraries in the country. The building itself, including the existing law library, seems cramped for work space as well as book shelves. If meaningful research is to be done there, the MCC library will need more room and a more ample collection of books than it now possesses. Balancing the several problems of logistics and finance, respondents may conclude that transporting the relative few who genuinely need this service makes more sense than contriving the expansions of the MCC library that would be necessary to meet minimum standards. Other possibilities exist: for example, respondents may wish to consider, in a City filled with eager law students, some arrangement under which inmates might be able (if they chose) to have the assistance of such students, volunteer lawyers, or others rather than enjoying the debatable right to wander freely, but perhaps blindly, among law library stacks. See *Stevenson v. Reed,* 391 F.Supp. 1375, 1379 (N.D.Miss.1975), aff'd, 530 F.2d 1207 (5th Cir. 1976).

Within 90 days from the date of the decree herein, respondents will report to the petitioners and the court their chosen mode of compliance with the court's direction that inmates with need therefor be given physical access for reasonable periods

to adequate law library facilities. If respondents' determinations are disputed, counsel for petitioners will have 15 days in which to bring on objections and counter-proposals for the court's consideration. If respondents choose to comply by improving the MCC library itself, they must complete and expand its collection.[17] The open-ended handling of this subject at this stage is meant as an invitation to collaborative and imaginative management by respondents themselves. The court will be receptive in this light to proposed elaborations or modifications within the broad terms of what is held to be compulsory under the law.

There remain questions concerning typing and duplicating needs for legal submissions to the courts. The institution supplies one typewriter for each unit; petitioners say this is not enough and that there must be "an adequate supply of typewriters on the housing floors for use by petitioners in the preparation of legal materials."[18] The vagueness of the demand reflects the lack of solid foundation for the claim. The provision of more typewriters would be desirable. Perhaps the Bureau will acquire them in some future budget. But there is no ground for ordering more by court decree. *Eisenstadt v. Britton*, 478 F.2d 855 (5th Cir. 1973); *Stubblefield v. Henderson*, 475 F.2d 26 (5th Cir. 1973).

On the other hand, respondents' prohibition against inmates' acquisition or possession of their own typewriters is, on this record, arbitrary and capricious. As is true of other restrictions respondents have imposed upon personal possessions, this one is supported by no suggestion of sufficient or persuasive reasons. The Constitution may not confer a right to have a typewriter as an incident to the right of access to the courts. *Tarlton v. Henderson*, 467 F.2d 200 (5th Cir. 1972). But it is clear that a typewriter is a valuable implement for this purpose; that typed papers may leap more vividly than handwritten ones to the watery judicial eye; and that a barrier against this kind of support for cherished interests ought to have solid justification in reason and experience. Lacking any such support, respondents' prohibition against typewriters should and will be enjoined.

Finally, as to duplication of papers, the court finds petitioners' complaint unsupported by the evidence and dismisses this aspect of it.

■ 6. *General Library.*—The MCC has a central lending library from which inmates may order books which are shown on a list available in each unit. Additionally, racks of paperback books are placed in each unit. The library is stocked primarily from donations. Every four to six weeks, the institution receives as donations from drug store book racks between 1500 and 4000 paperbacks that have been stripped of their covers, and these are divided among the units. Magazines are collected by the Education Coordinator from the Post Office's dead letter office and divided among the units.

Petitioners seek, but the court will not grant, an order requiring a central library to which they may have physical access, as is their position regarding the law library. Since the court enjoined enforcement of respondents' "publishers only" rule, 428 F.Supp. at 340–41, inmates may receive reading matter from friends and relatives. There are magazines and books on each floor although, admittedly, they may not

---

**17.** There is a stipulation, with some evident inaccuracies, as to what the library now contains. Without reproducing that list, the court will require respondents' report of compliance to contain a re-checked and accurate account of what is now on hand plus volumes to be added. As to the latter, in addition to the books now in the library, the decree will require that the Federal 2d and Federal Supplement series be extended back to 1950; that missing volumes in the several series now stocked be replaced; that the Modern Federal Practice Digest be completed and the Federal Practice Digest Second be added. Petitioners would add, *inter alia*, various items of state law. In New York City, respondents should be able to satisfy this demand by including in their compliance proposals some lending arrangements with nearby libraries or some means of giving inmates access to those libraries.

**18.** Petitioners' Post-Trial Memorandum 341.

please all tastes. There is television on each unit. Newspapers are available from the commissary. One need not, and the court does not, find the MCC an agreeable place for an addicted reader in order to hold, as the court does, that respondents are not failing in their legal duties in this respect.

7. *Education.*—The educational programs available to the inmates include "GED" (General Educational Development—High School Equivalency Diploma), English as a second language, adult basic education, college courses through the Empire State College programs (including federal grants to cover inmates' tuition payments), and classes in art, dance, creative writing, human sexuality and family dynamics, life skills, world politics, sculpture, and drama. A closed circuit television system has been installed (it is not yet operational) which will allow inmates access to over 100 programs upon request.

Considering that the institution is but two years old, this is not an unimpressive catalogue. To be sure, school catalogues are not the most precisely reliable documents. And there are patent defects, including the fact that most classes are confined to single units, so that offerings are unavailable because of insufficient enrollment when there might be enough students were they drawn from the place as a whole. Once more, the court notes a hope that a rethinking of movement restrictions may lead to amelioration. But whether or not that happens, petitioners' demands for expanded educational programs cannot be granted by the court. The difficulty of organizing a meaningful education program for a largely transient and extremely diverse population cannot be overestimated. All things considered, respondents are doing not merely an acceptable, but a commendable job in this respect.

8. *Jobs.*—Petitioners complain that there are not enough job opportunities available to inmates. There are no work-release programs; some inmates are employed in the institution either for low pay or none at all. The court is asked to order that respondents offer "constructive employment" to all inmates who wish it; that these inmates be paid at the federal minimum wage; that no inmates be required to work more than eight hours per day, five days per week; and that convicted prisoners be allowed to participate in work-release programs.

The court is not persuaded of any ground for interference in this area. Respondents appear to make genuine and earnest efforts to create employment opportunities. Inmates are employed in a variety of clerical and administrative tasks, though there are, of course, a limited number of these. Many work at jobs they would not have chosen in the outside world, such as kitchen and sanitation work, but this is to be borne in the nature of the case. The institution has just received authorization for a broom and brush factory, a "first" for a detention facility.

It remains a regrettable fact that jobs are not available for many of the inmates. But this is among those gravest of social ills that courts cannot cure. It is not utterly irrelevant that the case has proceeded during a time of severe unemployment all over the land, especially among minority groups disproportionately over-represented in jails and prisons. The MCC is located in a large urban center where there are far too few jobs even for those not in correctional facilities. See, e. g., "New York is Lowest in Youth Employment," *New York Times*, August 2, 1977, p. 30, col. 1. Respondents appear to be doing what they can. The court may not expect or order more.

9. *Commissary.*—Among the deprivations of the modular arrangement is the absence of a commissary, like those in many other penal institutions, where inmates may visit and shop for snacks, tobacco, and other things. An order form is distributed to inmates weekly, and orders are filled within the next day or so. Inmates are permitted to spend a total of $15.00 per week or up to $50.00 per month. Prices are set to cover the salaries of the commissary staff, and are subject to change without notice. There is no place to list a second choice on

the order form; thus, if the inmate orders Brand A and it is out of stock, his order is returned with this advice, there being no means to have shown that Brand B, or even X, would have been preferred to nothing. When the institution is being inventoried, no orders are taken.

Deposits to inmate commissary accounts are made by the institution pursuant to "authorization" forms signed by inmates, allowing the institution to endorse checks and money orders made out to inmates, and deposit them in the MCC's bank account. These forms appear, however, to have been executed in many cases at and for institutions other than the MCC. Money orders are credited to an inmate's account within one day; checks are cleared within 30 days. Five days each week, the institution accepts deposits during two specified hours directly at the institution.

Petitioners seek a variety of changes in these commissary arrangements:

(a) The establishment of a commissary they may visit every other day, or, alternatively, the acceptance of orders daily.

(b) A place for alternate choices on order forms.

(c) Cessation of the cashing of checks and money orders in the absence of specific consent to MCC's exercise of this authority.

(d) Speedier clearance of checks.

(e) Removal of the $50.00 limit.

(f) Sales at "cost."

(g) Extensions of the hours when deposits may be made in commissary accounts.

The court will grant, at least in part, the first four of these requests.

█ The opportunity to visit at a store is among the small material pleasures most sorely missed in the MCC. The testimony reflects this; the court could know it judicially. Notwithstanding this, the court finds no constitutional or other basis upon which it could order the provision of this amenity. On the other hand, the niggardly allowance of orders once weekly, plus the cavalier neglect to allow even second choices on the order form, represents a level of indifference that satisfies legal as well as lay notions of arbitrariness and caprice. The practice respondents defend means that an inmate unlucky enough to arrive the day after commissary orders are taken goes two weeks without the snacks or toiletries or tobacco he would wish to buy. The denial of a place for second choices reflects, in a petty but galling fashion, the kind of indifference the Bureau of Prisons has striven with much success to avoid in other respects. See *Wright v. McMann*, 387 F.2d 519, 525–26 (2d Cir. 1967). The quality of this stance is reflected in a Post-Trial Memorandum, where respondents say (218fn *):

"Petitioners' suggestion that the ordering procedures provide for alternate selections is a good one, and respondents will endeavor to implement it at the MCC. There is, however, no basis for the contention that such an administrative reform is constitutionally required."

There is no suggestion in this observation, or elsewhere, why respondents propose only to "endeavor," with no clear confidence of success, to meet this minimum dictate of reasoned decency. Nor is there any sound reason why the MCC, unlike jails and prisons across the land, should allow orders only once weekly. It takes less than the Constitution to require correction of this condition.

To remedy these aspects in which the MCC's practices must be condemned as arbitrary and capricious, the court will require that commissary orders be taken at least every other day and that the forms make provision for second choices. At least one court has been more liberal, requiring arrangements for daily commissary orders. *Miller v. Carson*, No. 74–382–Civ.–J–S (M.D.Fla., Jan. 31, 1975). It was thought that a Florida jail could and should manage that. Perhaps respondents will strive successfully toward the same goal. Perhaps if the Bureau of Prisons comes to be widely outdone in this and other respects, there will be no reasonable ground for sustaining the continued lag. For the time being, the provision now made seems suitably conserv-

ative and sufficient. As for the second choices, the enforcement of respondents' favorable inclination accords with a weighty judgment closer to home. *Giampetruzzi v. Malcolm,* 406 F.Supp. 836, 846 (S.D.N.Y. 1975) (Lasker, J.). The court will so order.

■ The practice of endorsing inmates' checks and money orders without their specific consent is not defensible, and must be ended. There was testimony by a number of petitioners that remittances of this nature were on many occasions expected by them but never credited to their accounts. There is not sufficient evidence of specific conversion or misappropriation, but the Center's practice invites and supports hostile suspicion. It is arbitrary and capricious and, if there is need to add it, a taking of property without due process of law.

■ A related item of seeming neglect, neither explained in the record nor seemingly explicable, is the 30-day delay before a check is credited to an inmate's account. Whatever banking and postal troubles we may lately have seen, this is not allowable on any reasonable basis. The MCC will credit checks in not more than 15 days unless there is good cause, duly communicated, for doing otherwise.

■ The remaining complaints concerning the commissary must be rejected. The limit of $50.00 monthly is dubious. It will bear reexamination as prices continue to rise. But it is not beyond respondents' powers, especially as mitigated today by the determination that receipt of packages be allowed. (See *infra.*)

■ There is no legal basis for demanding commissary sales at cost.

■ Finally, it is plausible to demand that there be an expansion of the hours for deposits in commissary accounts. But the record contains no concrete evidence of hardship on this score. As problems arise, if they do, respondents should have primary authority to consider their extent and possible solutions.

## B. OVERCROWDING

In the architectural and logistical plans as they were finally fixed, the MCC was designed to house a maximum of 449 inmates. That "rated capacity" has been routinely and substantially exceeded throughout the short history of the jail. Even before it opened, rooms designed for single occupancy were being fitted with double bunks to hold two inmates—an arrangement since discontinued by order of this court, 428 F.Supp. 333, 335–40 (1977). There remain problems of overcrowding postponed to the plenary trial. Petitioners complain against two conditions, the existence of which respondents do not dispute: (1) the housing of 20 inmates in dormitories designed for 10, and (2) the use of common areas for sleeping men on cots, or even on the floors. The court finds that petitioners should prevail on both of these contentions.

Preliminarily, there is much to be said, resting upon broad principle and specific precedent, for the proposition that confinement in numbers that exceed rated capacity is in itself impermissible. *Detainees of the Brooklyn House of Detention for Men v. Malcolm,* 520 F.2d 392, 398 (2d Cir. 1975); *Ambrose v. Malcolm,* 414 F.Supp. 485, 493–494 (S.D.N.Y.1976); *Taylor v. Sterrett,* 344 F.Supp. 411, 423 (N.D.Tex.1972), aff'd in part, rev'd in part, 499 F.2d 367 (5th Cir. 1974), cert. denied, 420 U.S. 983, 95 S.Ct. 1414, 43 L.Ed.2d 665, reh. denied, 421 U.S. 971, 95 S.Ct. 1969, 44 L.Ed.2d 463 (1975); *Hamilton v. Schiro,* 338 F.Supp. 1016 (E.D. La.1970), order entered *sub nom. Hamilton v. Landrieu,* 351 F.Supp. 549, 551 (E.D.La. 1972); *Miller v. Carson,* 401 F.Supp. 835, 899 (M.D.Fla.1975); *Pugh v. Locke,* 406 F.Supp. 318, 322 (M.D.Ala.1976), citing order entered jointly in *Pugh* and in *McCray v. Sullivan,* 399 F.Supp. 271 (S.D.Ala.1975). When the respondents, or others with roles of authority in the responsible agencies, designed the MCC, they knew and intended, in the apposite word of defendant Director Carlson, that the facilities to be built would not be "plush." So it is significant that they planned, and proclaimed the plan, that the MCC would house 449 inmates, not the much larger numbers they quickly con-

trived to bundle into the building. See *Hanly v. Mitchell,* 460 F.2d 640, 643 (2d Cir. 1972), cert. denied *sub nom. Hanly v. Kleindienst,* 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972); *Hanly v. Kleindienst,* 471 F.2d 823, 826 (2d Cir. 1972), cert. denied, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1974). It is not necessary to hold defendants' own plans and ratings against them with the force of invariable regulations. Cf. *Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954); *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *U. S. ex rel. Donham v. Resor,* 436 F.2d 751 (2d Cir. 1971); *Smith v. Resor,* 406 F.2d 141 (2d Cir. 1969); *United States v. Heffner,* 420 F.2d 809 (4th Cir. 1969). It may be that deviations from rated capacities will in a proper case be justified. On the other hand, it will not do to argue, as respondents do, that their ratings may never be held binding lest the jailers proceed forthwith to abandon civilized estimates and publish only barbaric plans.[19] On that appraisal of executive probity, we could never have had the long line of cases, of which a few are cited just above, holding officials to their own voluntary regulations.

▆ In this court's view, it is enough for this case to say that the rated capacity as given by the prison officials themselves is strong evidence of what the facility and its components should hold. Approaching the two specific problems in that light, the court has confronted (a) living conditions grossly short of minimal decency, and (b) no semblance of justification except the gener-al defense that the facilities of the Bureau of Prisons are *in toto* insufficient to house all the people consigned to them. That sort of defense has been rejected over and over again in cases involving state prisons. *Rhem v. Malcolm,* 527 F.2d 1041, 1043–44 (2d Cir. 1975); *Detainees of the Brooklyn House of Detention for Men v. Malcolm,* 520 F.2d 392, 399 (2d Cir. 1975); *Rhem v. Malcolm,* 507 F.2d 333, 341 n.20 (2d Cir. 1974); *Gates v. Collier,* 501 F.2d 1291, 1319–1320 (5th Cir. 1974); *Jackson v. Bishop,* 404 F.2d 571, 580 (9th Cir. 1968); *Nadeau v. Helgemoe,* 423 F.Supp. 1250, 1264 (D.N.H.1976); *Hamilton v. Love,* 328 F.Supp. 1182, 1194 (E.D.Ark.1971); *Holt v. Sarver,* 309 F.Supp. 362, 385 (E.D.Ark.1970), aff'd, 442 F.2d 304 (8th Cir. 1971). It has become clear by now that the exuberant rate at which we jail people [20] exacts a price for humane accommodations unless we are to repeal or revise principles of decency lately evolved. It is also clear in this light that the defensive posture of respondents must be deemed infirm. We are told that all the Bureau of Prisons facilities together can house approximately 22,500 people whereas the higher total of 29,050 were, as of the time of trial, assigned for federal confinement. The court is driven to a narrowly dispositive answer and a relevant observation or two.

*First,* and perhaps decisively, the court may adjudicate only upon the case and the facility before it; whether or how other jails or prisons may be stretched to greater capacity is not directly or meaningfully presented. While the court is not free to

---

**19.** Respondents' Memorandum 101–102:

"[E]nforcement of a 'rated capacity' rule as petitioners suggest can only discourage planners from experimenting or providing additional amenities in terms of the physical environment and the amount of space as has been done at the MCC. To the contrary, it will encourage planners to moderate, and indeed, to gear their designs to providing only the absolute minimum amount of space (or initially rating their facilities at such a minimum) in order to establish the highest possible capacity for fear that in a future emergency situation of a rising population the courts would not permit an upward adjustment of capacity even within the limits of generally accepted square footage require-ments. Such a development would be unfortunate, indeed."

**20.** See United Nations Document A/CONF.56/6, "The Treatment of Offenders, in Custody or in the Community, with Special Reference to the Implementation of the Standard Minimum Rules for the Treatment of Prisoners Adopted by the United Nations," Annex II (working paper prepared by the Secretariat for the Fifth United Nations Congress on the Prevention of Crime and the Treatment of Offenders, 1975). The cited document reflects the leadership role of the United States in numbers of people incarcerated *as a proportion of* the population. See, also, *U.S. Prison Population Sets Another Record,* 3 Corrections Magazine 3 (March 1977).

ignore the total setting, it is neither equipped nor authorized to judge the Bureau of Prisons as a whole. We do not know—we are not told—how varying conditions and facilities elsewhere may be thought to serve lawfully in confining numbers greater than originally intended. This case concerns a particular facility designed largely for pre-trial detainees and for other purposes associated with an urban jail-type structure connected with busy urban courts. Generalities about a whole prison system, lumping everything together and serving up grand and unparticularized totals, cannot play a material part in decision of this concrete case.

*Second,* the standards the court may enforce are minima; they may not be ignored or avoided on claims of administrative burden or expense.

*Third,* even a court may know that the numbers now confined in federal prisons are comfortably within the capacities of the Nation to house in conditions of minimum decency. We have produced adequate housing for hundreds of thousands in short days or weeks when the urgencies of warfare required it. The richest country in the world, carrying the message of human rights around the world, is capable of finding decent living quarters for the 6550 excess of prisoners over the 22,500 for whom there are said to be existing facilities. All of us whose jobs have to do with incarcerating people—the lawmakers, the prison officials, and the judges—are in some measure collaborators. But we are all bound to our separate duties under the oath to support the Constitution and the laws. When, as here, a case is properly brought to assail conditions of confinement, it cannot be a sufficient defense that circumstances variously conceded to be "undesirable" or "uncomfortable" or "unsatisfactory" or other-

wise regrettable must be held sufficient because the money to improve them has not been appropriated.

Upon the broad premises thus stated, we turn to the specific issues relating to the dormitories and the use of common areas as sleeping quarters.

■ 1. *The dormitories.*—The dormitories were each designed to house 10 men on single beds.[21] They have been refitted with double bunks, and are now holding double their intended number. This means there are 20 men in each dormitory, or a total of 120 on the unit rather than the 60 for which the unit was designed. The result is described by respondents as "unsatisfactory" but not unlawful. "Unsatisfactory" is a mild characterization. The situation within each dormitory is one of intolerable crowding, strain, and distortion of facilities, and an obvious potential for the tensions of stretched nerves. Similar consequences permeate the unit as a whole; common facilities designed for 60 men are jammed and rendered miserable when made to serve for 120. The doubling of dormitory occupancy is held, in sum, to descend below the constitutional minimum, both for detainees and for sentenced prisoners, including those in the MCC on writs.

The list of oppressions and discomforts from packing two men into each space meant for one is not short. The double bunks are crampingly close together; single beds similarly spaced would be tolerable, if by no means luxurious. The common furniture within each dormitory has become a clutter—roughly doubling the two tables and eight chairs originally planned—so that there is scarcely room to move about. The common toilet facility is grossly inadequate.[22] Privacy is, of course, nonexistent

---

**21.** Petitioners claim the number should be nine. They rely upon an early sketch, changed as the plans progressed. The evidence sustains the view of respondents that the matured plan contemplated 10.

**22.** Each dormitory has a common bathroom with two sinks, one urinal, one toilet bowl, and one shower. It has been suggested in our rec-

ord that this might do for as many as 15 men. Accepting that stinting estimate, we might order the dormitories reduced to no more than 15 occupants if toilet facilities were the only problem. But the cumulation of difficulties from packing 120 men into facilities for 60, and the overall absence of any suggestion of a viable number in between, leads ultimately to a ruling for the original design, and not more.

in a dormitory, but the wretchedness of forced company is intensified by the added crowding and noise of twice the number meant to be there.[23] The solace of reading and writing is impaired for those who might use it; reading lights meant for 10 single beds are blocked for those in bottom bunks.

The increase from 60 to 120 spreads discomfort and deprivation throughout the common facilities of the unit. The common area as a whole, which is all the men have for recreation and eating outside the dormitories, has become unacceptably crowded and noisy. A kitchen designed to heat food for 60 people cannot perform adequately for 120. Exercise equipment and common furniture are overtaxed and impaired for everybody. Like the dormitories themselves, the common space is generally more constricted, noisier, and more unpleasant than its designers envisioned.[24]

The visiting room, subject of other, separate complaints, has a special quality of bedlam in the dormitory unit. Planned for visitors who might be expected by 60 inmates, that room is not sufficient for 120.

This matter of the dormitories is not reducible to arithmetic, but has been the subject of arithmetical debates that are not irrelevant. Petitioners, taking the dormitory by itself, calculate that the inmate has only 43.25 square feet of living space, far below the bare minimum set by correctional experts and some courts.[25] But this excludes the common area entirely. Respondents would divide the common area among the 120 people in the unit, arriving at 68 square feet per inmate for his share of dormitory plus common space. But this ignores the modular principle, neglecting the important fact that other jails (and cases) include relatively accessible gymnasiums, auditoriums, chapels, and outside recreational areas, none of which are divided up and "allotted" to individual inmates for purposes of calculating square feet of living space. Without playing more detailed games with numbers, the court is driven to conclude that petitioners' calculation is closer to the mark and that the "correct" number, whatever it is thought to be, is below an acceptable minimum.

Concluding, as the court does, that doubling the occupancy of the dormitories is to be enjoined, we confront a somewhat nebulous question: where should the line be drawn? It seems improbable, if not impossible, that petitioners would have prevailed on this issue had room been made for an eleventh inmate, and no more, in each dormitory. In granting relief, then, it might be possible to guess our way toward some

---

**23.** Petitioners have sought a determination that dormitories may not be employed at all, that each inmate *must* have a separate room unless he or she consents to dormitory living. While that is by no means an extravagant proposal, according as it does with standards widely supported, American Bar Association, *Tentative Draft of Standards Relating to the Legal Status of Prisoners* § 6.12(b) and Commentary, 14 Am.Crim.Law Rev. 559–61 (1977) (hereinafter "ABA Standards"); National Advisory Commission on Criminal Justice Standards and Goals, Corrections § 2.5(1) (1973), the court is not persuaded that it may be ordered as a matter of either constitutional or statutory right. There is tension, to be sure, in shared sleeping quarters. There are some obvious dangers of assault and other injuries even if the record before us lacks specific illustrations. But the problems seem manageable enough to leave the choice within the judgment of respondents. Perhaps we shall evolve to the higher minimum petitioners urge. At the moment, we are too close to wars and barracks, and too aware of slum housing visible from this court-house, to hold that dormitories are *per se* forbidden. Cf. R. Titmuss, *Essays on the 'Welfare State'* 85–87 (2d ed. 1963). The separate, narrower question of classifying inmates so that dangerous men are not placed in dormitories has been dealt with above.

**24.** Again, the factors might not singly condemn the arrangement. The court has ruled, for example, that the noise level is not in itself beyond limits we might order. It remains higher and more unpleasant than it would be had the plans been followed, and it adds to the totality of factors leading to condemnation of respondents' departure.

**25.** The American Correctional Association sets the standard at 75 feet. *Ambrose v. Malcolm,* 414 F.Supp. 485, 489, 492–493 (S.D.N.Y.1976). Some decisions have accepted less. *Pugh v. Locke,* 406 F.Supp. 318, 334 (M.D.Ala.1975) (60 square feet); *Gates v. Collier,* 423 F.Supp. 732, 743 (N.D.Miss.1976) (50 square feet).

number well below 20 but possibly above 10. But respondents, having chosen simply to pile 120 men into spaces for 60, have tendered no evidence that could justify any confident determination of some intermediate number. Moreover, their tendency to exceed rated capacity in repeated and varied respects—in double celling, in the dormitories, in the balconies (*infra*), and elsewhere—counsels against sanctioning any departure of this kind. We apply wisdom of respondents themselves—especially in view of the fact that sudden influxes of short-term residents are routinely to be expected, and allowed for, in the MCC—when we hold the spaces to rated capacities in the absence of some solidly based rationale for doing otherwise.[26] The decree will order that the dormitories be used as they were meant to be, for 10 men each. Since this is a court of equity, both sides may appeal to the aspects of conscience and flexibility informing the familiar jurisprudence. An emergency—some powerful showing of necessity and suitability—may justify a relaxation at some future time. For now, however, the law and the evidence compel an order restoring the living conditions respondents planned and represented.

2. *Sleeping in corridors and common areas.*—With a frequency that respondents (having the detailed facts) have chosen not to identify exactly, but averaging several nights in substantially every week, inmates are assigned to sleep on cots in corridors, on balconies, or in other common areas because there is no room elsewhere to which they may be assigned. Respondents try to avoid this concededly unsatisfactory arrangement to the extent possible. Inmates are moved from the common areas as soon as room space opens for them, in order of length of stay in the open sections. Nevertheless, the practice is so regular and widespread that according to respondents' own evidence, people sleep in common areas for up to five or more days at a stretch. Further indicating the extent of the arrangement, as many as six to nine inmates have been assigned to sleep on a single balcony for one or more nights.

■ For a place of pre-trial detention, where it was known from the outset that there would be a large transient population, respondents must be found to have acted arbitrarily and capriciously, in violation of their statutory duties, in allowing such a condition to prevail. The inmate assigned to sleep on a balcony or similar open space has, literally, zero square feet of his own living space. His cot is unfolded only at night. His belongings are stored in boxes taken from him in the daytime. The lights burn all night. However many happen to be spilled into the common area for the night, there is one bathroom available for all.

Admittedly distressed by this situation, respondents offer nothing sufficient to justify it. Here, as elsewhere, they tell of an overcrowded prison *system*. They tell of measures they have taken—placing immigration detainees elsewhere, renting a new Community Treatment Center, and adjusting bus schedules—, then despair of doing anything more. Considering all the marvels of modern transportation, the several other facilities within relatively short distances, and the known character of MCC uses, respondents demonstrate nothing like the compelling necessity that might justify an occasional night, if not whole weeks, on a balcony. The overall growth of prison population cannot be permitted to come as an ugly miracle upon our prison experts, justifying miseries and degeneration in advance of the opening of new and "modern" facilities. Aside from that, the sweeping explanation that things are overcrowded everywhere simply bypasses the concrete questions in this concrete case. To elaborate on a thought expressed earlier, "over-

26. Respondent Warden recounted that shortly after opening the MCC, overflow inmates were housed in an area intended to be a magistrate's courtroom on the third floor. Originally this was limited to inmates stopping over en route between other institutions and "weekenders," but as pre-trial and sentenced inmates began to be assigned to the temporary dormitory, its use was discontinued to avoid the temptation to use the room as a permanent housing facility. The area is currently used as a staff lounge.

crowding" in Springfield, Missouri, or on the open spaces at Eglin Air Force Base, or at the country barracks of Allenwood, or in maximum security prisons (assuming those places *are* all overcrowded) may mean quite different things, may generate quite different issues, and may allow of different (perhaps better) justifications than anything even suggested here. What we have in this case is a newly planned and newly built facility, supposedly constructed with foreseeable needs in view, and dedicated instantly to misuse and wretched living arrangements for those confined in it. Designed primarily for presumptively innocent detainees and others expected to stay for short periods, the MCC had to be known in advance as a place where there would be relatively large influxes and exoduses during short spans of time. Knowing that, respondents have proceeded from the outset to handle fully expected events as if they were astonishments and emergencies. Inmates arriving predictably in somewhat unpredictable numbers overload the place and have no proper area of any kind in which to sleep or live their time of confinement. The balconies and other common areas become in practical effect substantially regular portions of the sleeping accommodations.[27]

Such a swift perversion of a supposedly planned and newly opened jail cannot be allowed. The failure to plan for the most obvious needs, resulting in distress for inmates readily acknowledged by respondents to be grievous, must be deemed both (a) a violation of the statutory duty to "provide suitable quarters and provide for the safekeeping, care, and subsistence of all" federal detainees, sentenced inmates, and witnesses in custody, 18 U.S.C. § 4042(2), and (b), more broadly, the kind of arbitrary and capricious action correctible under the Administrative Procedure Act.

The decree to be entered will forbid the use of MCC's common areas as sleeping quarters.

### C. VISITING

1. *Family and social visits.*—When this case began, inmates were allowed three visits per week. Visiting hours were:

| | |
|---|---|
| 2d and 5th floor: | 8:30–11:30 a.m., every day |
| | 4:30– 7:30 p.m., weekdays |
| 9th floor: | 8:30–11:30 a.m., every day |
| 3d, 7th, and 11th floors: | 12:30– 3:30 p.m., every day. |

Each inmate could have a list of six visitors, family or friends. On January 13, 1976, the respondent Warden gave four days' notice that he was curtailing both the hours and the allowable list of visitors. This remarkably brief notice, to both the affected inmates and the court, during a lawsuit, contrasted notably with the substantially longer notice the Warden had given to the union representing members of the prison staff. Petitioners moved by order to show cause to prevent the abrupt curtailment. First by temporary restraining order, then by a preliminary injunction, the court granted the requested relief. 406 F.Supp. 1243 (1976).

Petitioners pressed at trial contentions that the visiting arrangements thus preserved *pendente lite* were inadequate. They presented testimony, supplemented by the court's observations, that delays in processing visitors and visiting room conditions tended to abbreviate severely the time available for actual visiting within the range of seemingly available hours.

The detailed proof of these propositions covered the visiting process from the visitor's arrival to departure. The visitor arriving at the MCC's entrance lobby fills out a form which is given to a guard. The form is checked against the inmate's visiting list, and the inmate's living unit is determined from a locator list. When a number of

---

**27.** The Government's expert, George Camp, First Deputy Commissioner of New York State Division of Criminal Justice Services, testified that common areas "should not be used on a regular basis" as sleeping quarters. It reflects no lack of deference to observe that expert opinion may not have been necessary to make the point. The grave discomforts, for those assigned to sleep this way and for everyone else, could have been predicted. The record of this case fulfills the prediction.

visitors have been so processed, a guard ushers them through a magnetometer, frisks each visitor with a portable metal detector, and searches female visitors' purses. The visitor's hand is then stamped with a password in an ink visible only under ultraviolet light. The guard calls the inmate's unit and informs a member of the staff that the inmate has a visitor. Visitors are then taken up to the residential floors.

On each floor, between the two modular units, there are two visiting rooms, one for each unit, separated by a central guard room. Visitors enter through the guard's room and are ushered into the visiting rooms on either side. The visiting room, the dimensions of which are about 22' × 19', contains one or two couches and a number of chairs, often supplemented by chairs the inmates bring in from the common area within their units. The visitors' room has a bathroom adjoining it, but this, through most of the months this case was pending, had been locked and barred from use following a reported instance when an inmate had used it to change clothes and effect an escape.

Visitors are admitted into the respective rooms by the guard at the central desk. After the visitor's arrival, the unit guard locates the inmate, and brings him or her to the visitors' room. Visitors and inmates are observable from the guard's desk through the glass walls of the visitors' room.

There was persuasive testimony that these visiting procedures were so conducted that the processing of a visitor from lobby to visiting room could consume from 35 minutes to two hours, depending on the number of visitors at a given time. There were seemingly well-founded complaints that visiting rooms became overcrowded, hot, and noisy. The range of visiting hours, compressed by the processing routine, contributed to the crowding, noise, and general discomfort, including frequent occasions when there were not enough seats for those in the room. Overcrowding led the guards frequently to terminate visits after stays of

less than an hour, and well before the end of the ostensible visiting period. The locked bathroom made it necessary for a visitor needing such facilities to sacrifice the time for a round trip to and from the lobby for that purpose.

Respondents proceeded through some remarkable changes of position during the pendency of this case. When he came on to testify as a witness, on March 27, 1977, the Warden, who had found in January, 1976, a need to cut visits sharply and precipitately, announced a liberalization of visiting privileges. Now, we have been assured, another guard will be added in the lobby for expediting the processing of visitors. In addition to existing morning hours, all visiting rooms will be open from 12:30 p.m. to 4:00 p.m. and again from 5:30 p.m. to 7:30 p.m., Tuesday through Friday. Additionally, each unit except the dormitory will have 3½ hours of visiting on Saturday and Sunday, alternating mornings and afternoons (i. e., Saturday morning and Sunday afternoon in one week, then Saturday afternoon and Sunday morning the next). The dormitory visiting room will be open both morning and afternoon sessions on weekends.

Having acknowledged that "the visiting program has not been completely problem-free,"[28] but having improved the situation substantially, respondents observe that "[the new] system for visiting * * * provides substantial visiting opportunities for all inmates and clearly surpasses constitutional requirements."[29] There is an implication that further court intervention would be unjustified.

There are, however, countervailing considerations of some consequence. As will appear further in the course of today's rulings, the respondents have repeatedly found it suitable during the pendency of this case to improve conditions of which petitioners complained. It is plain that most of these improvements have been spurred by the lawsuit and would not have happened otherwise. The visiting situation is in some

28. Respondents' Post-Trial Memorandum 127. 29. Id. 132.

respects the most striking and unsettling of all these incidents. Within the space of little more than a year, respondents have ricocheted from a decision that visiting should be more restricted to a conclusion that it will be liberalized.

Against this background, the matter is not fairly ended when we conclude, as the court substantially does, that respondents should not be ordered to allow more visiting opportunities and facilities than they have now confirmed. Whether or not the court would have ordered this much over respondents' opposition, we now have the clearest kind of demonstration that this much is feasible and approved by respondents themselves. The feasibility in the future will be even more certain under this court's decision, which elsewhere orders population decreases that will ease the pressure of numbers upon visiting procedures and facilities. In such circumstances, it seems wholly equitable to require that respondents not diminish or impair the stated arrangements at any future time except upon a showing of good cause for the change. The decree to be entered will so order. In the circumstances respondents have themselves created, "the court's order should constitute no additional burden." *Zurak v. Regan,* 550 F.2d 86, 95 (2d Cir. 1977). Specifically, it will be adjudged that respondents may not decrease visiting hours or allow deterioration in visiting processes or facilities except after notice to the court and petitioners of an intention to do so and a showing of good cause for such action to be made not less than 30 days after the giving of notice.

One other aspect of the visiting setup requires action by the court. As has been mentioned, after one was used in connection with an escape that should have been preventable in the light of the MCC's elaborate security arrangements, all the visiting room bathrooms were locked, and they stayed locked for a period of some eleven months. A week before the Warden testified, respondents effected another of their revisions *pendente lite.* The bathrooms are now accessible to a visitor upon request; a guard, equipped with the key, will open the facility and admit the visitor who has asked for this assistance. The court finds from its observation of all the pertinent circumstances—including the elaborate measures to ensure that only people duly stamped, inspected, and scrutinized pass through the series of locked doors to the outside—that the annoyance and indignity of this bathroom arrangement is not justified. Here and throughout, the court is keenly cognizant of the fact that prison officials, not judges, are primarily in charge of safety and security in places of confinement. At the same time, the court is not free to blink away the common awareness that zeal for security is among the most common varieties of official excess.[30] Here, having observed the locks, the array of closed-circuit TV cameras, the invisible ink, and the long, slow journeys of court and counsel through the security network on our several visits, the court is compelled to conclude that the locked bathroom, accessible only with a guard's help, is an arbitrarily and capriciously excessive item of protection, unjustified by the vague and unexplained history of one improbable escape. The visiting room bathrooms will be kept open, lockable only by the occupants, during visiting hours.

Having ordered that much, the court is not persuaded that petitioners have shown grounds for sundry other forms of claimed relief in relation to family and social visits. There is no constitutional or statutory basis for ordering the lengthened hours (8:00 a.m. to 10:00 p.m. daily), the unlimited rosters of visitors, the provision of a non-smoking room on each floor, and other amenities petitioners demand, however desirable some or all of these might seem to the court as a matter of policy. We note in this connection that another coincidence in the case has been the placement of soft-drink machines in the visitors' rooms while the court was hearing evidence about the absence of such luxuries. It is to be hoped that such im-

---

**30.** See G. Sykes, *The Society of Captives* 19–21 (1958).

provements, however prompted, will continue. The court concludes, however, that it is not empowered to order them.

2. *Attorneys' visits.*—When this action was instituted, procedures and physical arrangements for attorney-client meetings, especially in view of MCC's primary function as a pre-trial detention center, were gravely deficient. A significant number of visits by attorneys were made in the general visiting rooms, under the same conditions of noise, crowding, and nonprivacy as those attending social visits. In addition, the visiting rooms were open for meetings with attorneys after general visiting hours. With advance notice, counsel could have special visits in private rooms. There were serious problems of long delays and other inconveniences.

It has become unnecessary, however, to review in detail the situation for which the case was in part brought and to which much evidence was addressed. Again, "[t]he MCC has recognized that there have been problems with the attorney visiting facilities and procedures, and in order to remedy these problems, the institution has developed new facilities." [31] These improvements were announced by respondents shortly before the trial began. The new facilities are to include five attorney conference rooms as well as a larger common space furnished with conference tables. This area will be open from 8 a.m. to 8 p.m., seven days a week. A stairway, which attorneys may travel unescorted, will lead directly from the lobby to the conference area. Attorneys will be issued special identification passes, and it will no longer be necessary to give the advance notice formerly required for special visits.

■ Agreeing that these changes will substantially improve the circumstances of attorney visiting, petitioners request that the court order certain "refinements" in order to protect inmates' Sixth Amendment rights. The court has concluded that petitioners can demonstrate no right at this time to more than respondents have volun-

teered. It may be that the new arrangements, as yet incomplete and untested, will be found defective in one respect or another. As respondents' plans are projected, however, they seem amply to accommodate the need for attorney-client access.

Accepting the revised facilities and procedures as sufficient, the court will merely require, as in the earlier determination respecting social visits, that respondents maintain the promised improvements and neither effect nor allow deterioration in attorney-client visiting arrangements without prior notice and a showing of good cause.

■ 3. *Visits with codefendants.*—Respondents report that an unnamed judge of this court in an unnamed case once "very strenuously objected" to the allowance of meetings between codefendants awaiting trial in the MCC. Seemingly built upon that episode is the current policy of denying such visits in the absence of specific court orders directing them. With all deference to all colleagues in every branch, the court finds the policy indefensible. Except for the unavoidably burdensome incidents of confinement, pre-trial detainees have an elementary right to prepare for trial. The right must include for them, as it does for people on the outside, reasonable freedom to confer with codefendants. Respondents must supply such opportunities in the absence of a specific court order in a specific case forbidding this.

4. *Conjugal visits.*—With perhaps more proof than even a court might require, petitioners have demonstrated that the deprivation of sexual intimacies is a cause of tension, frustration, and anguish. A distinguished expert, Dr. Columbus B. Hopper, testified to experience in Mississippi and elsewhere indicating that conjugal visits are salutary and feasible. Other experts and inmate witnesses supported his view. Upon a substantial record of this nature, and invoking decisions protective of sexual privacy and freedom, e. g., *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14

**31.** Respondents' Post-Trial Memorandum 118.

L.Ed.2d 510 (1965), petitioners claim a constitutional right to conjugal visits. As the case developed, their use of the word "conjugal" became somewhat expansive; they presented as star witnesses a married male prisoner and an unmarried female prisoner, both serving sentences, who seek conjugal visits with each other.

This extension of the position highlights what the court finds to be the essential flaw. The problems of sexual behavior, the extent to which sexual activity must be sacrificed for one perceived public necessity or another, the variety of beliefs about marital, nonmarital, and other kinds of sex, the kinds of deprivation suitably to be allowed as punishment—matters like these are in the realm of mores and public attitudes outside the proper sphere of judges as judges. Whatever one judge or another might think about the difficult policy choices and psychological factors—for example, about the question of strictly "conjugal" visits in the traditional sense and their possible effects upon unmarried inmates— the decision of such matters must be left in the foreseeable future for elected representatives of the people.

Petitioners acknowledge the conflict of views on this subject among experts and policy-makers. Indeed, on a count of the voices, respondents, notwithstanding a quaint typo, are substantially accurate when they say petitioners' Dr. Hopper "admits that the dormant [sic] view of correctional experts in this country is still opposed * * *."[32] The weight of judicial authority is likewise adverse to petitioners. *McCray v. Sullivan,* 509 F.2d 1332, 1334 (5th Cir. 1975); *Sandoval v. James,* No. C–72–2213 RFP (N.D.Cal., Oct. 3, 1975); *Lyons v. Gilligan,* 382 F.Supp. 198 (N.D.Ohio 1974); *Wayne County Jail Inmates v. Wayne County Board of Commissioners,* Civil Action 173–217 (Wayne Cy.Cir.Ct. 1971). But petitioners are not daunted. They do not acknowledge, they proclaim, the paucity of authority, saying:

"Only one court has had the courage to find that inmates are entitled to conjugal visiting as a matter of constitutional right. *Government of the Virgin Islands v. Gereau,* 3 Prison L.Rptr. 20 (D.V.I., May 30, 1973)."

■ With all deference, and without stopping over the meaning of "courage" in such a context, this court rejects the challenge. Whether or not there may be conjugal visits in federal jails or prisons is left for the Congress and the Executive to decide.

## D. TELEPHONES

Three subjects are argued with respect to the telephone service provided inmates at the MCC: (1) the extent to which respondents are in compliance with the preliminary injunction issued with respect to telephones earlier in this case, (2) petitioners' claim that the existing services should be expanded, and (3) the validity of Bureau of Prisons Policy Statement 7300.79 (2–20–73) ¶ 2 which permits the monitoring of inmate telephone calls.

1. *The outstanding injunction.*—Telephone service at the MCC is currently governed by order of this court entered October 1, 1976. Pursuant to that preliminary injunction, there are 23 pay telephones in the institution on which calls can be made to the 212 area. There are also 23 long-distance telephones on 11 trunk lines which are routed through a switchboard. In order to make a long-distance call, an inmate must pick up one of the receivers and wait for the switchboard operator to answer. The operator will then place the call, provided that the inmate has previously signed up to make it. It is this last requirement, when applied to collect calls, which petitioners charge violates the preliminary injunction.

In proceeding toward a conclusion on this point favoring the respondents, the court recalls that the preliminary injunction came into being when the Telephone Company (without fierce resistance from the MCC) was about to rip all telephones out of the MCC because of an alleged plague of fraud-

32. Id. 135.

ulent credit-card and third-party calls. The injunctive arrangements were devised to deal with that problem while assuring a decent amount of telephone service for the inmates. The debate then and since has featured complaints by petitioners that there were not enough telephones, that long queues resulted to make calls, and that the situation led frequently to angry encounters and threatened violence among the inmates. It was in that setting that long-distance calls were ordered to be either collect or "pre-paid," the latter meaning payment would be made from the inmate's commissary account. Petitioners accept the system of advance sign-ups for pre-paid calls, but complain that the procedure is a gratuitous obstruction for collect calls. At the same time, not quite consistently, they charge, as has been noted, overtaxed telephone facilities, leading to frustration and conflict.

■ Much is made in the briefs on this issue concerning what was or was not intended by the preliminary injunction. The court concludes, however, that this is not now a matter of great interest. We are proceeding to a final decree. For that purpose, the court concludes that the sign-up requirement for collect calls is a reasonable and valid measure. It serves petitioners' own stated objective of avoiding disputation over limited telephone facilities.

2. *Adequacy of telephone service.*—Petitioners complain variously about the number of telephones, delays in raising the MCC operator for long-distance calls, and the wall-mounted instruments which afford less privacy than would booths.

■ No claim for relief has been proved on this score. The evidence of overburdened telephones is neither impressive on its own nor improved by the court's own observations. The telephone service is undoubtedly imperfect. But it is in its setting adequate, if not generous.

3. *Monitoring.*—Respondents claim the power to "monitor" telephone calls, a position embodied in Bureau of Prisons Policy Statement 7300.79 (2–20–73), which says in relevant part:

"2. *Monitoring Calls.* Each institution will establish procedures which will enable the monitoring of phone calls, said monitoring to be done to preserve the security and orderly management of the institution, and to insure that institution policy governing the use of phones is being followed."

MCC Policy Statement 7300–79 ¶ 7 (10–12–76), adopted pursuant to the Bureau of Prisons Statement, adds:

"It should be pointed out, however, that Bureau Policy concerning access to attorneys allows inmates to place calls to their attorneys that are private. In keeping with the spirit and intent of this Policy, the MCC will not under any circumstances monitor attorney-client calls."

Petitioners assail the asserted authority to monitor, however it may be limited, and now seek an injunction against it. The point, if properly presented, would be substantial.

■ Respondents answer, however, and the court agrees, that the question has not been timely or suitably raised. It was not in the first amended petition or in any later amendment. The only pertinent testimony in the record is fragmentary and more or less accidental. Respondents had no occasion to develop, by evidence and otherwise, supposed justifications. On the contrary, defendant Warden's contribution, on cross-examination, was to report that no calls have in fact ever been monitored in the MCC. On such a record, the court should not and will not reach one of the few conceivable issues petitioners managed not to include properly in this case. Cf. *Browning Debenture Holders' Committee v. DASA Corporation*, 560 F.2d 1078, 1086 (2d Cir. 1977).

This leaves the subject of telephones where it has been since the preliminary injunction issued last October. Respondents have not appealed that order, nor have they offered new evidence or arguments to change it. Petitioners' arguments for additional relief have been overruled. It follows that the court should and will embody the terms of the preliminary injunction in the final decree.

## E. MAIL

Several issues concerning mail were disposed of by summary judgment last January, when the court enjoined the reading of outgoing mail, sustained respondents' practices on "legal mail" (from attorneys and courts), and restricted respondents' surveillance and scrutiny of other incoming mail. 428 F.Supp. at 342–344. Some residual problems remain with respect to legal mail and respondents' procedures for delivery and forwarding mail.

1. *Legal mail.*—In ruling on the summary judgment motions, the court held adequate respondents' practices safeguarding the confidentiality of legal mail—namely, their rules allowing opening (not reading of) such mail for contraband, but only in the recipient's presence. It has become evident, however, that there is less than rigorous enforcement of these restrictions; in repeated instances, too numerous to be allowable slips, letters of this nature are delivered to the inmates after having been opened outside their presence. The record makes it appropriate that the court's decree command adherence, subject to appropriate sanctions for violation, to the agency's own rules.

There is in this connection an unnecessary dispute about the scope of "legal mail" for present purposes. After the court's decision of January 19, 1977, the Bureau, on May 23, issued revised regulations advising inmates that all "Special Mail," suitably marked, would be handled with the restrictions now approved and ordered for correspondence from attorneys and courts. "Special Mail," in addition to that from federal courts and attorneys, includes under the revision correspondence from "members of Congress, embassies or consulates, the U. S. Department of Justice, governors, State attorneys general, prosecuting attorneys, [and] state courts * * *." [33] No reason is suggested why the court's decree should be narrower. The decree will, in any event, be coterminous with the regulations.

2. *Delayed mail.*—There are complaints that mail is unduly delayed after it reaches the institution before delivery to inmate addressees. This is perhaps a difficult, but not an impossible, contention to prove, as reflected in court orders requiring prompt deliveries, *Mitchell v. Untreiner,* 421 F.Supp. 886, 902 (N.D.Fla.1976); *Collins v. Schoonfield,* Civ. No. 71–500–K (D.Md., July 27, 1972); *Boldings v. Jennings,* No. 76–73C2, 3 Prison L. Rptr. 259, 260 (W.D. Wash.1974); *Lambert v. Skidmore,* No. C–2–74–135 (S.D.Ohio, May 30, 1975). But there is no convincing proof of the charge in this case. There is evidence of mail delayed in the Christmas season, but this is familiar on both sides of the prison walls. The claim of delayed pickups of outgoing mail is no more solidly supported. Petitioners' complaints on these subjects are rejected.

3. *Non-forwarding of mail.* —When an inmate is transferred from MCC to another institution—often abruptly as will be discussed—mail thereafter received is not forwarded, but returned to the sender. Acknowledging this, respondents insist upon their right to continue the practice. They say:

> "Since there is no evidence indicating that inmates are unable to send change-of-address notices to the local Post Office station either before or after the transfer, there is no reason to impose that burden on the MCC." [34]

Even if such cold niggardliness is not a characteristic note, one might have hoped for its omission. The court does not sit, of course, to enforce magnanimity in government. But this is a clear case where a callous and ungenerous position happens also to be unsupportable in law.

It is not to be doubted that the distinguished respondents in this case appreciate the fundamental human needs answered by the mails to people in confinement. See, e. g., if citation is needed, *Taylor v. Sterrett,* 532 F.2d 462, 481 (5th Cir. 1976). Yet the

---

**33.** 42 Fed.Reg. 26,333, 26,336 (May 23, 1977) (to be codified in 28 CFR § 540.11).

**34.** Respondents' Post-Trial Memorandum 185.

bureaucratic indifference exercised in respondents' names brushes past simple decency for no good reason whatever. In the nature of the situation, inmates' mail will be returned to sender, not forwarded, when they have had no chance at all to redirect it for themselves by filing change-of-address notices. This is so, obviously, because transfers are sudden, often occurring after the sending, but before receipt, of the letter MCC finds itself unwilling to forward. Even where this is not so, the "burden" that worries respondents is inconsequential. The piece of mail must be handled in any case—whether to be returned or sent to its addressee. The extra trouble of digging out and writing a forwarding address—a beneficence commonly performed by irate former landlords, jaundiced ex-employers, and others not looked to for public examples of caring—is of no meaningful weight in this setting. Finally, as respondents must know as well as anyone, they deal with a group in which literacy, attention to workaday detail, and knowledge of agency procedures may be less prevalent than it is in the population at large. If an inmate neglects (or does not know about) a change-of-address notice, MCC personnel might find ready means to supply the omission rather than fight for the right to return the mail to its sender. The court will not compel, though it presumes to suggest, this procedure.

The court holds, however, in any event, that the refusal to forward mail is a species of obstinate neglect of vital needs that qualifies classically as arbitrary and capricious official conduct, totally unsupportable by any reason that can be deemed sound or sufficient in the circumstances. The court will order the relief petitioners seek in this respect.

## F. SEARCHES

Two areas of dispute remain under this heading following the court's earlier decision, on summary judgment, 428 F.Supp. at 341–43, requiring that petitioners be given receipts for things seized from their quarters: (1) the propriety of strip searches as routine procedures following visits, and (2) the practice of excluding inmates when their sleeping areas and possessions are being searched. On both subjects, the court concludes, petitioners are entitled to some relief.

The broad principles governing these questions as of now may be briefly summarized. It seems evident that people in confinement enjoy at least some of the Fourth Amendment's protection "against unreasonable searches and seizures * * *." *Bonner v. Coughlin,* 517 F.2d 1311, 1317 (7th Cir. 1975) (Stevens, J.); *Hodges v. Klein,* 412 F.Supp. 896, 899–903 (D.N.J.1976), collecting cases. Undoubtedly the protection "does not rise to that possessed by the unincarcerated members of society." *Bonner v. Couglin, supra,* at 1317. But there are points, which the court finds to have been transgressed in this case, beyond which searches and seizures, even in a jail, must be condemned as constitutionally "unreasonable."

There are also due process boundaries set by "the community's sense of fair play and decency." *Rochin v. California,* 342 U.S. 165, 173, 72 S.Ct. 205, 210, 96 L.Ed. 183 (1951). These limits, too, are exceeded by the forms of strip search respondents employ.

1. *Strip searches.*—Under the questioned practice, every inmate—including pre-trial detainees held on charges ranging from mail embezzlement through stock fraud to narcotics dealings and bank robbery—undergoes a strip search upon returning to his quarters from any visit. In the presence of a corrections officer, the male inmate must remove his clothes, display his armpits, open his mouth, raise his genitals, display the bottoms of his feet, and spread his buttocks for visual anal inspection. Female inmates must follow a similar procedure, including a visual vaginal inspection. The testimony of inmates and experts alike reveals qualities in this experience that a court might come close to noticing judicially. The stripping is unpleasant, embarrassing, and humiliating. The spreading and lifting of genitalia and the

bending over to spread buttocks for anal inspection plunge the reaction to a level of deep degradation and submission. The postures petitioners are compelled to assume are calculated to trigger, in the officer and inmate respectively, feelings of sadism, terror, and incipient masochism that no one alive could have failed to predict. In the MCC, as elsewhere in such situations, male correction officers have been incited by the temptation to indulge the sense of a cheap *machismo.* There have been insultingly suggestive remarks and banal but terrifying expressions of aggression like those of guards threatening in the time of nakedness to "put [a] foot up [the] ass" or merely to "kick the ass" of the humbled prisoner. The court credits the testimony of inmates who have found this so high a price as to forego visits or to feel after a visit that it was not worthwhile.

A psychiatrist called by respondents acknowledged that the strip search experience "is something that may not be wished," but went on to say "that it is part of the reality of the circumstance in which it is not only appropriate from a standpoint of the institution's security, but is something to which people can adapt and recognize and I would doubt that anybody was so severely upset by such an experience that they would require psychiatric care or, again, that there is a question of after effects of it." Accepting the psychiatric observations, if *dubitante,* but not those on security, the court holds that constitutional injury may occur short of emotional trauma leaving scars or requiring treatment.

The asserted justification for this grisly procedure is, of course, the claim that it is needed for security against the smuggling of weapons, drugs, and other contraband. As for specific experience, one female officer once espied in a prisoner's vagina a red balloon containing heroin. Another testified to discovering drugs in an inmate's shoes. There was no evidence that anal inspections had ever revealed any attempts at smuggling, and this is no surprise. The evidence is clear and uncontradicted that a person bent upon this mode of transport could insert an object beyond the anal sphincter and render it invisible until its retrieval at some private moment later on.

But it must be added that the case for respondents is not ended with their slender proof of actual episodes when smuggling attempts were thwarted in strip searches. Defendant Warden and Bureau Director, among others, testified to a belief, which has a measure of plausibility, that the prospect of the strip search may serve as a deterrent to people planning to secrete and import forbidden things. The fact that the judgment is neither quantifiable nor flatly demonstrable does not deprive it of the authority with which respondents' experience and expertise must be deemed to invest it. Giving full weight to this factor, the court finds that it cannot justify the more extreme and offensive aspects of the strip search.

The test of reasonableness requires attention to the total setting. It is significant, therefore, that the inmates and their visitors are in full view during the visits and fully clad. The secreting of objects in rectal or genital areas becomes in this situation an imposing challenge to nerves and agility. The challenge, it must be expected, is surmountable by some, but likely in itself to deter many or most, especially pre-trial detainees who may be hoping to vindicate their presumed innocence and may be hesitant to accomplish a new crime in the very arms of the law. For the probably slim minority who might attempt to smuggle things in their bodies, there remain search techniques short of the loathesome practice now in force. The paramount worry is, or ought to be, over possible importation of weapons or other dangerous instruments. These are discoverable by metal detecting devices and, if necessary, other equipment employed for airline security and other purposes.

There remain other things, mainly narcotics, that might still be secreted and evade detection. How serious this problem may be—and how far controllable by measures like the usual searches and urine tests—it is not possible to say with confi-

dence. What we can know is that the goal of absolute security is unattainable, and we must assume that some contraband will continue to make its way into jails and prisons, as it always has—whether through visitors, guards, lawyers, clergymen, or otherwise. The court does not propose to treat lightly the security concerns of respondents. In today's resolution of the strip search problem, respondents will be permitted to go as far as may be permitted by the demands of reasonableness in the Fourth Amendment and the claims of decency in the Fifth.

■■■ The court concludes, upon the record and the developing precedents,[35] that respondents must cease the routine requirements of anal and genital inspections after visits. These affronts, repulsive in the most evident respects, are not warranted by the suspicions upon which respondents have proceeded. In all the circumstances, the demands of security are amply satisfied if inmates are required to disrobe, to have their clothing subjected to inspection, and to present open hands and arms to demonstrate the absence of concealed objects. Even this much the court allows with grave reluctance, inviting reconsideration by wiser judges or respondents themselves in the more mature wisdom of future times. For now, however, sensitive to the primary authority of respondents for the protection of life and property, the court will forbid only the extreme measures of indignity now practiced. These, it is held, are unreasonable and "shocking," and thus forbidden by the Fourth and Fifth Amendments.

Also left to respondents by this ruling is the possibility of visually inspecting anal or genital areas upon a specific and particular demonstration of probable cause for doing so. In the rare cases where this may happen, the details of the probable cause must be recorded in writing, upon sworn statements of first-hand knowledge. The record will include the reasons, circumstances, and results of the search. A copy will be given to the inmate and preserved for later reference if and when a particular search or the practice in this regard comes again to be questioned. Cf. ABA Standards § 6.6(f)(iii).

2. *Room searches.*—The living areas of the MCC are searched at irregular intervals, and the searches are unannounced. The searches are of two types: formal unit shakedowns and informal searches of individual rooms (which are the more frequent type). For formal shakedowns, a team of guards clears the inmates from a particular portion of a living unit and searches each room. The inmates are not permitted to watch the searches. Correctional officers have discretion to allow an inmate to watch the informal search of his individual room. It is unclear how or how often this discretion is exercised.

■■■ Petitioners protest against the practice of barring them from positions where they may observe the searches of their rooms and possessions. The complaint rests upon some elementary concerns. In the MCC, as frequently happens elsewhere in the conduct of official searches, the few possessions of inmates are not treated with tenderness. Officers rummaging through clothing, papers, drawers, and other things,

---

**35.** The decided cases cover a range that does not amount yet to a settled or definitive jurisprudence. In conditions of high security risk, in cases distinguishable from ours, searches of the kind in question have been allowed. *Daughtery v. Harris,* 476 F.2d 292 (10th Cir.), cert. denied, 414 U.S. 872, 94 S.Ct. 112, 38 L.Ed.2d 91 (1973); *Hodges v. Klein,* 412 F.Supp. 896 (D.N.J.1976); *Giampetruzzi v. Malcolm,* 406 F.Supp. 836 (S.D.N.Y.1975); *Penn El v. Riddle,* 399 F.Supp. 1059 (E.D.Va. 1975); *Gettleman v. Werner,* 377 F.Supp. 445 (W.D.Pa.1974); *Bijeol v. Benson,* 404 F.Supp. 595 (S.D.Ind.1975).

A recent decision of an eminent colleague in the Northern District of New York goes farther in outlawing the practice than this court will in this case. *Frazier v. Ward,* 426 F.Supp. 1354, 1366 (N.D.Y.1977). The court in *Frazier* held anal searches to violate both the Fourth and the Eighth Amendments as applied to the States by the Fourteenth. Other authorities arrayed against "the indignities of a rectal search," *Sostre v. Preiser,* 519 F.2d 763, 764 (2d Cir. 1975), in at least some circumstances include *Hodges v. Klein, supra,* at 903; *United States ex rel. Guy v. McCauley,* 385 F.Supp. 193 (E.D.Wis.1974); and ABA Standards § 6.6(f)(iii).

supposedly obliged to be neat, frequently aren't. Possessions are left in disarray. It is charged—but the court finds it unnecessary (indeed, impossible on the present record) to decide one way or another—that possessions are stolen by searching officers. This complaint had special point and urgency in the past, when respondents gave no receipts for seized property, a practice enjoined by the court on January 5, 1977, 428 F.Supp. at 342. The suspicion or belief remains a vital source of tension and hostility.

Allowing inmates to observe from a reasonable distance the searching of their rooms would go far to eliminate these grounds of complaint. An officer viewed by the owner is more likely to fulfill the stated duty to put things back as they were. The claim of stolen property is far less likely to be made, the grounds for suspicion, or ostensible suspicion, being largely obviated. Having one's things searched is no pleasure in the best of circumstances. Being denied the right even to watch the invasion is a blunt oppression.

Respondents justify the exclusion on two grounds. As phrased by defendant Warden Taylor,

"the [first] reason * * * is to prevent inmates from distracting officers who are doing the searching and moving contraband from one area to another ahead of the search party. * * *

"The other consideration is that during searches there sometimes arises a situation in which the inmate becomes argumentative and conflicts do develop between staff and inmates over the search."

These grounds are thought and urged by the Warden to override his view, expressed in the same response, that "it is important to preserve [and respect] as much as possible * * * the privacy of the inmate."

The court concludes that, at least with respect to pre-trial detainees, the Warden's appraisal of the competing interests cannot be sustained. The presumptively innocent prisoner's acknowledged interest in privacy and, it may be added, in minimal dignity, may be overriden only upon a demonstration of compelling necessity. *Detainees of the Brooklyn House of Detention v. Malcolm,* 520 F.2d 392, 397 (2d Cir. 1975). The undocumented worries of respondents have neither the quality nor the substantiality to supply the demonstration. The ingenuity of experienced jailers is sufficient, surely, to prevent the successful movement of contraband from hand to hand while the officers are on the spot.[36] As to the threat of arguments and conflicts, this is always present, and subject to stern control, in the jailhouse. Prisoners may become disagreeable, or even violent, anywhere—at the meal table, at play, in the TV room. When that happens, authority must be asserted. If necessary, the prisoner must be moved away from the place of disturbance. But the possibility of disturbing behavior does not justify exclusion from the place where it may happen—from the dining area, TV room, etc. At least until or unless respondents can show a pattern of violence or other disruptions taxing the powers of control—a kind of showing not remotely approached by the Warden's expressions—the security argument for banishing inmates while their rooms are searched must be rejected.

In so holding, this court follows the high authority of Judge Lasker in *Giampetruzzi v. Malcolm,* 406 F.Supp. 836, 844–45 (S.D.N.Y.1975).[37] Following that precedent with respect to pre-trial detainees, this court refrains from extending it to convicted inmates. The wisdom of removing *any* prisoner from his quarters during a search

---

**36.** Respondents point to testimony that an officer once intercepted a package of marijuana being thrown by one inmate to another when he observed the search team approaching the unit. This is beside the point, of course; the alleged incident was not prevented by the procedure here in question, and there is no basis for finding that recurrences would become more probable if inmates could observe after the search party arrived and went to work.

**37.** The inmates in the cited case were pre-trial detainees specially classified as "security risks." In that respect, the petitioners herein have a stronger claim.

may well be questioned. If, as this court now holds, the practice is to be forbidden for pre-trial detainees, respondents may wish to reconsider it for others. Nevertheless, confining itself to the sharp limits of its powers, the court is unable to conclude that the procedure is "unreasonable" in Fourth Amendment terms for convicted inmates. For them, the asserted necessities need not be "compelling." While the Warden's explanation of the position is not overpowering, it is certainly not weightless. For the treatment of sentenced inmates, it passes the constitutional test.

## G. PERSONAL PROPERTY

In a society which holds property more sacred than perhaps it should, a person's identity and self-respect are deeply entwined with material possessions. We are accustomed to prize as basic necessities an array of balms, toys, and physical amenities that people in a simpler age knew or cared nothing about. It becomes a severe discomfort, to say nothing of self-respect and security, to do without a watch, accustomed gadgets, cosmetics, minor items for personal adornment, things to eat, drink, smoke, and chew without regard to nutrition or necessity in the sense of survival. The strong dependence upon material things as assurances that we exist gives rise to one of the deepest miseries of incarceration—the deprivation of familiar possessions ranging from the dwelling place to its furnishings to automobiles, a wardrobe, however modest,

and other paraphernalia supporting life in freedom for most of us.[38]

This aspect of incarceration is notably severe in the MCC. In contrast with its early billing as a showplace, conformably to the habitual stance of the Federal Bureau as a leader of penal enlightenment, the MCC's rules and practices governing possessions allowed to inmates have been markedly more restrictive than those in numerous state facilities, including a number of highly secure prisons. Petitioners have attacked these rules and practices. The attacks have in some respects been found to be well grounded.

■ 1. *Confiscating property.*—When this case began respondents claimed and exercised the powers to search an inmate's cell, barring any opportunity for the occupant to see what was happening; to seize property upon an officer's deciding it was "contraband;" to give no receipt or other account of what was seized; and to keep the property permanently, ostensibly for "The Government" but with no way in fact for anyone ever to know or question what had actually happened to it.[39] This regime of absolute and unquestionable tyranny was not softened by a sweeping definition of "contraband," which purported to embrace "any item or article inside an institution that was not issued by the institution, purchased in the commissary, purchased through approved channels or approved for issue by an authorized staff member."[40]

38. See G. Sykes, *The Society of Captives* 67–70 (1958); E. Goffman, *Asylums* 20 (1961).

39. Property, except for currency, which is seized as contraband is generally supposed to be turned over to the Chief Correctional Officer and destroyed under his supervision. On occasion, seized property is returned to an inmate's family or turned over to appropriate law enforcement officials. Currency seized by the respondents is supposed to be deposited in a Miscellaneous Fund maintained by the Department of the Treasury, and is not returned to the inmate from whom it was taken.

40. The quotation is from the Bureau's Custodial Manual, Policy Statement 2001.1B, § 702, which reads more fully as follows:
"1. Contraband may best be defined as any item or article inside an institution that was not issued by the institution, purchased in the commissary, purchased through approved channels or approved for issue by an appropriate staff member. Authorized items may be considered contraband when found in excess quantities, or altered from original status.
"2. The following items shall always be considered contraband, within any federal penal or correctional institutions:
"a. Guns and firearms of any type.
"b. Ammunition, explosives.
"c. Knives and tools not provided [according to regulations].
"d. Hazardous and poisonous chemicals and gases.

On a motion for summary judgment, the court ordered that respondents give receipts for seized property, 428 F.Supp. at 342, a step that might have led respondents to supply some explanation for the seizure and some opportunity to contest it. Respondents continue to insist, however, that there will be and need be no procedure by which an inmate can question the taking of property on an officer's pronouncement that it is "contraband." Petitioners are entitled to have this stance corrected, for it is, in the most severe and unrelieved terms, an assertion of power to take property without due process of law.

█ It should not be necessary, though it evidently is, to affirm in 1977 that federal prisoners, and most obviously confined people who have been convicted of nothing, are protected by the Fifth Amendment against takings of things in their possession without at least some chance to dispute the action and to justify the possession. *Weddle v. Director, Patuxent Institution,* 405 U.S. 1036, 92 S.Ct. 1318, 31 L.Ed.2d 577 (1972), vacating and remanding 436 F.2d 342 (4th Cir. 1970), for reconsideration in light of *Lynch v. Household Finance Corp.,* 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972); *Sell v. Parratt,* 548 F.2d 753, 757, 759 (8th Cir. 1977), cert. filed No. 76–1339 (March 28, 1977); *Kimbrough v. O'Neil,* 523 F.2d 1057 (7th Cir. 1975), aff'd on reh. en banc, 545 F.2d 1059 (1976); *Russell v. Bodner,* 489 F.2d 280 (3d Cir. 1973). Robustly opposing that proposition, respondents sound some chilling notes. There is no need for any opportunity to contest the confiscation, they say, because:

"[i]f the confiscation of a particular item is improper, the inmate has an adequate remedy in a common law action for reverter or conversion as well as a constitutional action for damages under the Fifth Amendment."[41]

If that were an answer, every official, high or low, could employ it as justification for lawless confiscations. The assertion is, moreover, uniquely astonishing when made by an agency that should normally be heard to insist upon exhaustion of its own administrative remedies before complainants haul it into court. Enough has been said to indicate why the court must regret and reject the proposal of high federal officers that their conduct be tested in state courts by the quiddities of the old common-law writs.

█ This court holds that respondents must afford an inmate some method of contesting a confiscation. The procedure need not be elaborate, certainly nothing like a case for reverter or conversion. In most situations, there will probably be no need for any semblance of a hearing. But procedures must exist providing for at least the following:

(a) A brief statement to the inmate of the asserted justification for the seizure.

(b) A notice of the right to respond in some reasonably simple and convenient fashion and assert grounds, if any, why the seizure is claimed to have been unwarranted.

(c) Some suitable opportunity to meet and answer controverted evidence thought to warrant confiscation.

(d) A decision, with reasons, however brief.

Mindful here and throughout that it is respondents who are primarily responsible for the MCC's governance, the court will not now prescribe the procedures in detail. The decree will require that they serve and file new procedures conforming to the directives outlined above, on the 90-day timetable, with 15 days for objections, prescribed earlier.

2. *Packages.*—MCC inmates are forbidden to import or receive packages of food or things like watches, radios, and sweat shirts, except for one Christmas package,

---

"e. Narcotics and drugs. These can be dispensed and in the possession of offenders only as authorized by the institution medical department.

"f. Intoxicants, such as liquor and alcoholic beverages.

"g. Currency, where prohibited."

**41.** Respondents' Post-Trial Memorandum 216.

though items of this nature may be purchased from the commissary. This restriction is sought to be justified on the present record by "dire predictions" which are not only unsupported by evidence, cf. *Goodwin v. Oswald,* 462 F.2d 1237, 1244–45 (2d Cir. 1972); *Rhem v. Malcolm,* 371 F.Supp. 594, 626 (S.D.N.Y.), aff'd and remanded, 507 F.2d 333 (2d Cir. 1974), but in several instances belied by experience or by respondents' own self-contradictions.

The record herein and the law books reveal repeated instances where prisons, often housing convicted inmates under close security, allow (or have been ordered to allow) the receipt of packages and the ownership of personal property more extensive than the MCC permits. See, e. g., *Feely v. Sampson,* Civ. Action No. 75–171 (D.N.H., Sept. 14, 1976); *Giampetruzzi v. Malcolm,* 406 F.Supp. 836, 842 (S.D.N.Y.1975); *Miller v. Carson,* 401 F.Supp. 835, 840 (M.D.Fla. 1975); *Inmates of Suffolk County Jail v. Eisenstadt,* 360 F.Supp. 676, 693 (D.Mass. 1973), aff'd, 494 F.2d 1196 (1st Cir.), cert. denied *sub nom. Hall v. Inmates of Suffolk County Jail,* 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 189 (1974); *Moore v. Janing,* Civ.No. 72 0 223 (D.Neb., March 8, 1973); *Bishop v. Lamb,* LV–1864 (D.Nev., Aug. 27, 1973). So, for example, inmates in New York State institutions may receive a 35-pound package of food each month, in addition to clothing and magazines. New York State prisoners may also possess electric razors, typewriters, and stationery.

■ The evidence of what is done elsewhere is not controlling upon respondents. But it does call upon these administrative experts to make some reasoned showing, surely for unconvicted people, as to why there must be deprivations at the MCC so much harsher than deemed necessary in other institutions. *Procunier v. Martinez,* 416 U.S. 396, 414, n.14, 94 S.Ct. 1800, 40

L.Ed.2d 224 (1974); *Moskowitz v. Wilkinson,* 432 F.Supp. 947, 951 (D.Conn.1977). Respondents have made no such showing. Their restrictive rules in this light must be held to be arbitrary and capricious, not merely as to pre-trial detainees, but as to all those in the Center.

The compelling drive toward this conclusion becomes more palpable against the justifications respondents offer. They invoke, as everywhere, the claims of security: weapons, drugs, and whatnot will enter in packages. But there has been not even an attempt to show why protective measures, familiar in use at other institutions, could not serve here.

Then it is urged that allowing personal property in jail will "provide the materials for buying favors among inmates or between inmates and staff, for gambling activities, and for the use of strong-arm tactics and other similar types of activities which are well-known and of real concern to correctional administrators * * *." [42] Similarly, respondents profess to worry about thefts, conflicts, and "aggravating the factor of economic inequality *." [43] These are not more solid than other ghosts, and respondents themselves help to prove it. The commissary offers items of substantial cost—e. g., $18 sneakers and $27 radios—serviceable for favors, for demonstrated inequalities, and other possibly baleful uses.[44] Apart from that, we all are, or ought to be, aware enough of past and present concentration camps to know that crumbs and scraps are enough to evoke propensities toward bestiality and mutual exploitation.[45] Petitioners may have allowed themselves to soar a little when they attack respondents' "pseudo-socialist principles." [46] The fact remains that it only demands a pseudo-equality to insist that all must be deprived arbitrarily, however much

---

**42.** Id. 211–212.

**43.** Id. 212.

**44.** Commissary arrangements present issues of their own, considered and decided below.

**45.** See, e. g., A. Solzhenitsyn, *One Day in the Life of Ivan Denisovich* (1963).

**46.** Petitioners' Post-Trial Memorandum 374.

greater the deprivations of some than of others.

Respondents also urge that packages will bring "sanitation and storage problems * * *." [47] Again, this is inconsistent with their own purveying of food that may attract vermin and require storage. Moreover, if packages are to be allowed, as they will be by this court's order, there is no doubt about respondents' authority to control volume, the nature and management of food, and other factors of genuine concern for decent housekeeping.

Finally, some note must be taken of the argument that for inmates serving sentences "the restrictions on the possession of personal property also serve the legitimate purpose of punishment." [48] This is a curious argument indeed. Most of us in the federal law business associate respondent Director Carlson with a good deal of penological wisdom extending well beyond, but surely including, the maxim that people are sent to prison *as* punishment not *for* punishment. *A fortiori,* the acknowledgment that defendants awaiting trial, and not lawfully subject to *any* punishment, are being punished in this way is a substantial confession of error, whether calculated or not. And it is, furthermore, a declaration that jailers are determining forms of punishment with no suggestion that their statutory powers were meant to embrace that profound responsibility.

The court concludes, in sum, that respondents have failed to offer any but arbitrary and unacceptable grounds for their stringent limitations upon personal possessions. Upon the record before the court, it seems clear that inmates should be free to retain or receive at least items of the kind available on order from the commissary. Once again, the precise details are primarily for respondents to formulate. As in the case of regulations concerning confiscations, and on the same terms and timetable, respondents will prepare and submit suitable regulations governing this subject.

## H. CLOTHING

Inmates at the MCC are not permitted to wear their own clothing except for sweat clothes and footgear on sale from the commissary. At the Receiving and Discharge Unit, they are issued underwear and jumpsuits. The jumpsuits are brightly colored—red, orange, yellow, and blue. The suits frequently do not fit. In fact the supposed flexibility of jumpsuits—in size and interchangeability between men and women—is one reason the respondents give for using these uniforms. Inmates complain that the suits are often wrinkled and sometimes torn. It is awkward to use the toilet while wearing them.

Inmates testified that the uniforms are "degrading," "dehumanizing," "depersonalizing," "an embarrassment." Some found them most distressing during visits, feeling embarrassed to have their families and friends see them in what they referred to as "clown suits," "monkey suits," or "Santa Claus suits." Petitioners' experts testified that requiring inmates to wear uniforms such as these is psychologically destructive, a "negation of their individuality." On the other hand, an expert called by respondents testified he wore one of the jumpsuits for 10 hours and did not find it degrading.

It is easy to be skeptical, even cynical, about the testimony *pro* and *con* concerning the psychological impact of MCC jumpsuits. For a litigious inmate, the idea of "degradation" or embarrassment may roll trippingly off the tongue. For a visiting expert, headed for freedom and privacy after the day's work, it is no feat to feel at ease in the very temporary garb assumed for an unreal experiment.

It has proved useful, therefore, to have the benefit of several periods of direct observation. The evidence of the court's eyes has tended to sustain petitioners' contentions. The jumpsuits are in fact garish. The MCC's personnel in charge of fitting will win no awards. The inmates are often discovered in uniforms several sizes too large, looking funny in a way likely to

---

**47.** Respondents' Post-Trial Memorandum 212. **48.** Id. footnote **.

amuse only others. There is every reason for the court to credit the reports of discomfort, embarrassment, and felt stigmatization, not least in the reflection seen in the eyes of visiting family or friends.

Without much defending the uniforms on sartorial grounds, respondents urge the necessity for this attire to distinguish inmates from others and thus promote the jail's security. The argument is unsupported by substantial evidence or plausible reason. Security in the MCC is elaborate; there are possibilities of escape, but they are almost negligible. Most inmates are confined to the unit for nearly 24 hours a day. While this may change, as the court hopes, there remains an impenetrable outer perimeter, defended by TV screens, double sets of doors, a closely guarded corridor, and extensive communications devices. Nobody enters without the invisible ink stamp. Nobody leaves without displaying it.

■ In the face of these facts, the requirement of uniforms rests upon foundations so tenuous as to be arbitrary and capricious. For pre-trial detainees, the best of uniforms is a dubious restriction. There is wide acceptance of the U.N. Standard stating: "An untried prisoner shall be allowed to wear his own clothing if it is clean and suitable." U.N. Standard Minimum Rules for the Treatment of Prisoners, Rule 88(1). Whether or not the Federal Bureau can manage to attain that standard, endorsed by many nations much less wealthy, it cannot justify compelled dress in a costume understandably experienced as humiliating in addition to its qualities of physical discomfort. As for sentenced prisoners, it is by now a matter of minimum decency that prisoners should, subject to security requirements, be "entitled to choose any * * * clothing they wish," ABA Standards § 6.7, or at least, where uniforms are required, be given clothing which "shall in no manner be degrading or humiliating." U.N. Standards, *supra*, Rule 17(1).

The practice of taking inmates' underwear and replacing it with government issue, often used, is altogether indefensible, and is not noticeably defended.

Upon the findings and conclusions thus outlined, the court will order as follows with respect to clothing:

(a) Pre-trial detainees will be permitted to wear their own clothing unless they volunteer to wear uniforms issued by the MCC. *Accord: Forts v. Malcolm*, 426 F.Supp. 464, 468 (S.D. N.Y.1977).

(b) Uniforms for men shall consist of shirts, slacks, and other conventional items. Uniforms for women shall consist of (i) dresses, (ii) blouses with skirts or slacks, or (iii) other items of standard apparel.

(c) Sentenced inmates will either be permitted to wear their own clothing or, unless they volunteer to wear one of the existing supply of jumpsuits, will be issued uniforms of the kind prescribed in "b," *supra.*

(d) Issued clothing will fit the wearer with reasonable accuracy.

(e) Inmates may wear their own undergarments or be issued new ones.

These provisions, given the limits of the court's expertise in matters of dress, are subject to reconsideration and modification upon due notice and hearing.

## I. FOOD

■ Menus at the MCC are organized in 30-day cycles. The meals are prepared in the main kitchen up to a day in advance and refrigerated. At meal times, the trays are sent up to the living units, where they are reheated in microwave ovens.

The meals are nutritionally adequate. In quantity, variety, and palatability, they compare not unfavorably with the food produced in other large institutional kitchens. Respondents, with certain exceptions to be noted below, take suitable pains with this basic aspect of life in or out of confinement.

Petitioners have, however, pressed a list of complaints about food. They assail the cooking and heating procedures; they want meals more wholesome and attractive; they demand more attention to the varieties of individual tastes; and they urge the need

for more suitable personnel, including outside civilians to replace some or all of the inmates who work in this aspect of the MCC's operations. Having heard the evidence and observed more than once the preparation and service of meals, the court rejects all of these demands as unfounded both in fact and in law.

██ One complaint, however, relating to sanitation, will be sustained. Respondents have been notably and persistently lax in allowing inmates to cook and serve food with luxuriant hair uncovered and bare hands. There is no excuse for this, and respondents offer none. The laxity has been open, notorious, and almost entirely unrelieved. Respondents have arbitrarily and inexcusably neglected their duty in this respect. They will be ordered to make and enforce appropriate regulations.

## J. DISCIPLINE

The amended petition in this case attacked numerous aspects of respondents' disciplinary procedures. Virtually all of these charges were dismissed at the end of petitioners' case-in-chief on the authority of *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). The only issues remaining concern the manner in which "administrative detention" is imposed at the MCC and the conditions under which administrative detention and disciplinary segregation are carried out.

1. *Administrative detention.*—Respondents' policies with respect to inmate discipline are set forth in MCC Policy Statement NY7400.5D (4–5–76). The Policy Statement defines "Administrative Detention" as

"the status of confinement which results in a loss of some privileges which the inmate would have if assigned to the general population. Generally a person placed in Administrative Detention will be locked in his or her own room on the

unit where he or she is normally assigned. Persons assigned to open dormitories will have to be transferred from their units to 9-South [the maximum security unit] when it is determined that Administrative Detention is required." ¶ 11a [49]

The occasions for administrative detention are defined as follows:

"An inmate may be placed in Administrative Detention when his attitude and conduct indicate that his continued presence in the general population poses a serious threat to life, property, himself, staff, other inmates or to the security of the institution, and when the inmate:

"(1) Is pending a hearing for violation of institution rules or regulations;

"(2) Is pending an investigation of a violation of institution rules or regulations;

"(3) Is pending investigation or trial for a criminal act;

"(4) Requests admission to Administrative Detention for his own protection or the staff determines that admission to or continuation in Administrative Detention is necessary for the inmate's own protection.

"(5) Is pending transfer or is in holdover status during transfer; or

"(6) Is pending classification or the gathering of information on the nature of an individual's offense, bail and prior record." ¶ 4(a).

The Policy Statement further provides that administrative detention may be ordered "by Correctional Supervisors, shift supervisors, or members of an inmate's unit management team (Unit Manager, Correctional Counselor, Case Manager). The Correctional Supervisor of the Watch must be notified immediately when an inmate is placed in Administrative Detention." ¶ 11(a)(1).

Under Bureau-wide "minimum standards," an inmate charged with misbehav-

---

49. "Disciplinary Segregation" is

"the status of confinement of an inmate housed in an individual cell, either by himself or with other inmates, separated from the general population, as a result of a hearing before the Institution Discipline Committee

in which the inmate has been found to have committed a prohibited act. Inmates in Disciplinary Segregation will have significantly fewer privileges than those housed in Administrative Detention * * *." ¶ 11b.

ior must be given "a written copy of the charges against him within 24 hours of the infraction," and a hearing must be held within 48 hours (excluding weekends and holidays) of the incident. ¶ 8(a), (b). The unit management team must "formally review the status of each inmate who spends seven (7) continuous days in Administrative Detention and thereafter such cases will be reviewed on the record each week and will be formally reviewed at least every thirty (30) days." ¶ 11(a)(2).

Petitioners charge, and the court finds, that respondents have not complied fully with their own policies concerning the imposition of administrative detention. One inmate was placed in administrative detention (for "malingering") for a period of ten days before a hearing was held, at which hearing he was acquitted of the charge. This same inmate was on another occasion placed in administrative detention pending hearing on a charge of "attempted escape." The hearing did not take place for approximately eight days after the incident (during which period the inmate was locked in), and then the inmate was acquitted.

Another inmate was placed in administrative detention for four days on a charge of possessing a marijuana cigarette, after which he was released without a hearing. Another spent three or four days in detention without a hearing for "unauthorized use of the telephone." The Associate Warden ordered a female inmate locked in because of her "negative attitude" some twelve hours after an incident on the women's unit. She was released four hours later.

At an earlier stage in the case, this court ordered the release of an inmate who had been held for 30 days in administrative detention "for his protection" without his consent.

■ The instances just reviewed involved disregard of the agency's own standards governing preferment of charges, the grounds for detention in a locked cell, and the appropriate speed for deciding charges on which such detention is predicated. However, the few cases are not enough to constitute a pattern or practice. And the affected individuals are not seeking specific relief for themselves. Nevertheless, it bears repetition that the agency is bound by its own regulations. The court and all affected persons are entitled to expect that those in charge, especially upon notice that violations have occurred, will take suitable measures to enforce compliance. These reminders, the court concludes, are enough on this subject for the time being. It is to be expected that respondents will scrutinize with care and duly implement their controlling policies limiting administrative detention to cases of genuine necessity, limiting the categories of officials who may impose it, requiring prompt notice of charges, and holding prompt hearings for inmates subjected to this form of harsh treatment.

2. *Exercise during confinement.*—The Policy Statement quoted above sets forth in detail the conditions under which inmates are to be confined either in administrative detention or disciplinary segregation. It says, ¶ 11(a)(3):

"*Conditions of Administrative Detention.* The basic level of conditions as described below for Disciplinary Segregation will also apply to Administrative Detention. To the extent possible, inmates housed in Administrative Detention will be afforded the same general privileges given to inmates in general population as is consistent with existing resources available and the security needs of the unit. Unless there are compelling reasons to the contrary, commissary privileges, reasonable amounts of personal property, and exercise periods exceeding those provided for inmates housed in Disciplinary Segregation will be provided. Visiting and correspondence privileges of the general population will be given inmates in Administrative Detention."

This should mean, *inter alia*, that people in administrative detention will normally have a daily hour of outdoor exercise plus the kinds of physical workouts possible with equipment in the units. On the other hand, inmates in disciplinary segregation are said to be entitled to at least two one-hour or

four half-hour periods of exercise per week. ¶ 11(c)(6).

Despite what is written, the record shows that inmates in administrative detention frequently receive no more, and sometimes have less, exercise time than is required for those in segregation. While this is another case of reminding respondents to do as their own rules require, the reminder is appropriately to be embodied in the decree. For the Policy Statement, like the law more generally controlling, says that only "compelling reasons to the contrary" can justify loss of "existing privileges" for people in administrative detention. It is suitable, therefore, to specify that this parity will be observed unless "compelling reasons," reported to the inmate in writing, are deemed to justify a departure.[50]

■ 3. *Religious observances.*—Inmates in segregation may be denied permission to attend religious services. They are, however, permitted to receive visits from a clergyman of their faith. It is clear that this kind of restriction may lawfully be imposed in the exercise of "a reasonable judgment" appraising the individual inmate against the security and safety needs of the institution. *LaReau v. McDougall*, 473 F.2d 974, 979 (2d Cir. 1972), cert. denied, 414 U.S. 878, 94 S.Ct. 49, 38 L.Ed.2d 123 (1973). There is no evidence in the record that respondents are administering this discretion in an arbitrary fashion, or, in fact, that they have ever exercised it at all. The petitioners have proved no valid grievance on this subject.

4. *Women's lock-in.*—The women's unit on 5-South of the MCC consists of single rooms which have sinks but no toilets. These rooms were originally designed for people expected to be on work-release, in a kind of "halfway house" status; they were never intended as places for locked detention. The women are not locked in at

night, as are the men, and may use the toilets located at the end of each corridor. When a woman is placed in segregation, however, or the entire unit is locked in for some reason, the inmates are dependent upon the guards to check periodically whether any of them need to use the toilet.

■ The guards are of varying conscientiousness with respect to this duty. Inmates have been locked in for many hours without being released to use the toilet. It appears that sinks have done service as toilet bowls when an extended banging on the door failed to attract a guard. Apart from this kind of unpleasantness, it falls today below an acceptable level of humaneness to confine a prisoner of any sex where he or she must solicit freedom to use a toilet.

The cases in which courts have considered and condemned locked cells without toilet facilities have usually involved generally barbarous conditions (of filth, vermin, cramped quarters, etc.) markedly inferior to those in the MCC. See, e. g., *Wright v. McMann*, 460 F.2d 126 (2d Cir.), cert. denied, 409 U.S. 885, 93 S.Ct. 115, 34 L.Ed.2d 141 (1972); *Kimbrough v. McNeil*, 523 F.2d 1057 (7th Cir. 1975); *Taylor v. Sterrett*, 344 F.Supp. 411 (N.D.Tex.1972), aff'd in part, rev. in part, 499 F.2d 367 (5th Cir. 1974), cert. denied, 420 U.S. 983, 95 S.Ct. 1414, 43 L.Ed.2d 665, reh. den., 421 U.S. 971, 95 S.Ct. 1969, 44 L.Ed.2d 463 (1975). It is a small and justified step from those decisions, however, to hold unacceptable for locked confinement even an otherwise decent cell that lacks a toilet. This court so holds. For sentenced prisoners, the condition must be barred today as cruel and unusual punishment. For pre-trial detainees, it denies due process. For both, the court's decree will forbid the further use of cells without toilets for lock-ins.

---

**50.** As quoted earlier, ¶ 11(a)(3) is also qualified in stating that equal privileges are to be afforded "[t]o the extent possible * * * [and] as is consistent with existing resources available and the security needs of the unit." For purposes of the court's decree, limitations to be imposed under this language will be treated along with "compelling reasons;" that is, they will be given to the inmate in writing.

## K. STAFF

Petitioners claim that the staffing patterns at the MCC are constitutionally unacceptable. Specifically, they contend that the institution is understaffed, thereby endangering inmates; and, further, that a "sex blind" policy of staff assignments improperly results in male staff on the women's unit, and vice versa.

■ 1. *Number of guards.*—During the day and evening hours (until midnight), one correctional officer is assigned to each modular living unit on Floors 5, 7, 9, and 11.[51] During the "morning watch" (midnight to 8:00 a. m.) one officer is assigned to an entire floor, i. e., two living units. The day and evening officers are responsible for a considerable list of duties in addition to supervising the unit: sick call, visiting, search, meals, and some other activities are among the responsibilities of this officer. Frequently, the officer must leave the unit to escort inmates. Petitioners contend that because of the number of functions this one officer must perform for the 48 inmates on the unit (60 in the dormitory under today's decision reducing the number from 120), he or she is unable to perform any of them efficiently, so that there are long delays in the delivery of service to the inmates and threats to their safety.

From midnight to 8:00 a. m., the single guard must divide his time between the two units on each floor. On all except the women's and honor units, the inmates are locked into their rooms, which have no mechanism for attracting the guard's attention. Therefore, inmates needing the guard—because they are sick, for instance—must pound on the door until the guard hears them.

Respondents argue that the nature of the MCC renders it simpler and safer to guard than the average institution, and that the evidence shows that the "staff has not only fully performed its duties in a professional manner, but has contributed significantly to the relaxed atmosphere of the institution." [52]

Courts have not hesitated to require penal institutions to assign and/or hire more staff when it appeared that understaffing endangered the well-being of the inmates. See, e. g., *Jones v. Wittenberg,* 330 F.Supp. 707, 715 (N.D.Ohio 1971), aff'd *sub nom. Jones v. Metzger,* 456 F.2d 854 (6th Cir. 1972); *Tyler v. Pereich,* 74–40–C(2) (E.D. Mo., October 15, 1974); *Incarcerated Men of Allen County v. Fair,* Civ. No. C 72–188 (N.D.Ohio, May 23, 1973); *Alberti v. Sheriff of Harris County,* 406 F.Supp. 649, 678 (S.D. Tex.1975); *Miller v. Carson,* 401 F.Supp. 835, 895–97 (M.D.Fla.1975); *Hamilton v. Landrieu,* 351 F.Supp. 549, 551–52 (E.D.La. 1972); *Jackson v. Hendrick,* 1971 No. 2437 (Pa.Common Pleas, April 7, 1972); *Sandoval v. James,* No. C–72–2213 RFP (N.D.Cal., October 3, 1975); *Joiner v. Pruitt,* No. 475–166 (Lake Cy. Ind. Sup. Ct., February 21, 1975); *Rhem v. Malcolm,* 371 F.Supp. 594, 628 (S.D.N.Y.), modified 507 F.2d 333 (2d Cir. 1974); *Hedrick v. Grant,* Civil No. S–76–162 (E.D.Cal., November 13, 1976); *Mitchell v. Unteiner,* 421 F.Supp. 886, 901 (N.D.Fla.1976). It remains clear, however, that the judgments of those who run the prisons carry great weight on questions of this sort, and that a powerful case must be made for substitution of judicial judgment.

In this light, the court is not convinced that the institution should be held to be understaffed. On the day shift, the unit officer is not actually alone; each unit has a staff of three to four persons (unit manager, correctional counselor, caseworker and/or secretary) who are in the living units a good part of the time. Petitioners have not shown that inmates are in any way jeopardized by the current staffing pattern for the 16 or so hours each day when they are not locked in. There is no evidence of violence, or threats of violence,

---

51. The inmates of the honor unit are the cadre who work throughout the building. There is one guard on duty in this unit during the day shift only. Unit 3, protective custody, has one guard on duty 24 hours a day.

52. Respondents' Post-Trial Memorandum 265.

which could be prevented by additional guards, or for which there is an urgent need to add guards. Cf. *Miller v. Carson, supra; Incarcerated Men of Allen County, supra; Sandoval v. James, supra.* It might be desirable on the unit, but petitioners have not demonstrated that the existing arrangement falls below a minimum enforceable by the court.

The question concerning the morning watch is closer. Inmate witnesses testified to the difficulty of attracting a guard's attention if one is needed at night. The solid cell doors and the lack of any call system by which guards can be alerted that an inmate needs them corroborate this testimony. While these assertions are not to be discounted, it is also true that no case was shown of any serious hurt or discomfort resulting from delay in raising a guard. The officer patrolling two units at night, when most of the inmates are asleep and locked in, has a relatively short distance to cover and a total of approximately 100 people to attend. The officer is expected to move about through the two units. The trip is not a long one. Unless the guard is asleep or indolent, a charge that has not been made, the tour through both units requires a very few minutes.

Upon the evidence in this record, the court cannot agree that two guards are, by any judicially enforceable standard, required for the performance of this assignment.

2. *Assignment by sex.*—Respondents hire and assign correctional personnel without regard to sex. Because of the practice of assigning one correctional officer to a unit, as discussed above, this policy frequently results in having a guard alone on a unit of inmates of the opposite sex. "Such staffing patterns," petitioners assert, "create the danger, recognized by the experts and inmates, of sexual relations, possibly without consent, between staff and inmates" as well as other "unwelcome intrusions" into inmates' privacy.[53]

The National Sheriffs' Association declares as a standard that "[n]o male employee or visitor will enter the female quarters in the jail unless advance notice is given and escort service provided by a female jail supervisor. Where there are women in the jail population a female supervisor is required to be on duty." See National Sheriffs' Association, *A Handbook on Inmates' Legal Rights,* Special Note at 3–4 (1974). *Jail Standards* (1977), proposed by The Nebraska State Bar Association Committee on Correctional Law and Practice, would forbid any "male facility personnel [to] enter [a] female inmate's living area, except in an emergency, without female facility personnel present." § 5–(7) at 75. See the similar provision in Rule 53, United Nations Standard Minimum Rules for the Treatment of Prisoners (1975). The cited standards enforce strong traditions, certainly familiar to a substantial portion of today's judicial personnel. And there is case law to the same effect. See *Forts v. Ward,* 434 F.Supp. 946 (S.D.N.Y.1977); *Hamilton v. Love,* 328 F.Supp. 1182, 1195–96 (E.D.Ark.1971); *Hamilton v. Landrieu,* 351 F.Supp. 549, 551 (E.D.La.1972); *Obadele v. McAdory,* Civ. No. 72J–103(N) (S.D.Miss., June 19, 1973).

The subject lies, however, in a sector of the community's mores where the state of flux is uniquely notable. The value placed upon privacy, as against unwanted intrusions by members of the opposite sex, remains high. But the particular concern for *female* inviolability, and the corresponding neglect of comparable male interests, is already somewhat anachronistic. To be sure, biological and cultural factors continue to make it a fact that violent sexual assaults are almost exclusively forms of male aggression. On the other hand, it was common knowledge long before Catherine the Great, to say nothing of the more recent portrayal by Wertmuller in the film *Seven Beauties,* that females may employ positions of power for sexual exploitation of males. Rational prison management, like other forms of social control, should reckon with such realities.

---

**53.** Petitioners' Post-Trial Memorandum 426.

In the last analysis, however, the overriding facts may well be the phenomena of uncertainty and change. And these counsel a tentative and gingerly approach by the judges. The community's standards are obviously prime concerns in deciding how to regulate contacts, relationships, and exercises of authority between people of opposite sexes. Judges are not by office or training specially qualified as the regulators.

Moreover, since rules and standards in this area affect selection and assignment of correctional employees, prescriptions in terms of sex confront powerful policies opposed to discriminations in employment based upon sex. Civil Rights Act of 1964, Title VII, 42 U.S.C.A. § 2000e *et seq.; Dothard v. Rawlinson,* —— U.S. ——, 97 S.Ct. 2748, 53 L.Ed.2d —— (1977).

We approach, then, in a setting of fluid and sometimes conflicting values, petitioners' contention that correctional officers should be people of the same sex as the inmates in the unit. The position is grounded upon some evidence of affronts to privacy. For the most part, the female petitioners are the main complainants in this aspect of the case. They charge, and the court finds, that male guards have been casual about walking into the rooms of female prisoners without allowing time for the occupants to arrange to be fully dressed. While the male officers are expected to knock first, and generally do, they have neglected to wait scrupulously for long enough to make the heralding effective.

Nor has this problem been faced only by female inmates. A male inmate testified to a female officer looking in on him while he was on the toilet. And during one of the court's tours, a female guard matter-of-factly led us, without warning the occupants, into a men's washroom and toilet facility. No consternation ensued. It is not possible, at any rate, to find out from a record otherwise bare on this score how common invasions of this type may have been.

There is no evidence at all on the present record of sexual abuse of inmates by correctional personnel. The court cannot proceed in this aspect on rumors or on judicial notice. If we did, we could scarcely emerge from the maze to which the topic leads. After all, the main literature and experience of sexual assaults in prison does not treat of heterosexual misbehavior. Were assault the main concern, having guards and prisoners of the same sex would not solve the problem.

■ Upon the evidence in this case, and upon the pertinent grounds of judgment and the judicial limitations suggested above, the court deems this a matter for minimal relief. Whatever different views may evolve as matters of social and legislative policy, there are no sufficient grounds for the broad commands petitioners seek. The court will not order the segregation of correctional personnel to match the sexes of the inmates. Neither the evidence nor general facts that might be judicially noticed warrant an order so drastic and confining. See *Dothard v. Rawlinson, supra,* at —— n.23, 97 S.Ct. 2748; *Sex Segregation of American Prisons,* 82 Yale L.J. 1229, 1241 (1973).

On the other hand, respondents must ensure more effectively than they have that the elemental requirements of inmates' dignity and privacy are observed. Suitable regulations (and the court's decree) must forbid entry into rooms or bathroom facilities by officers of the opposite sex unless (a) there has been sufficient warning or (b) emergent necessity justifies an exception. Suitable discipline—preferably by respondents, but by the court if necessary—will attend violations of these rules.

While the court should and will order no more at this time, the question must be deemed an open one as facts and attitudes continue to shift over time. If today's very limited directions prove insufficient to assure simple decency, a closer approach to petitioners' view may come to be required. On this, as on other topics, however, it is to be hoped that flexible adaptations by the people with day-to-day power and responsi-

bility will limit or obviate further interventions by the court.

## L. ADMISSIONS AND TRANSFERS

■ 1. *Admissions.*—All inmates entering or leaving the MCC are processed in the receiving and Discharge Unit ("R&D"). An inmate first assigned to the institution for confinement has his or her own clothing taken away (a practice to be modified under today's decision) and is given a uniform. The street clothes are kept in R&D and are reissued for visits outside the institution, with the process being reversed on return.

Petitioners complain that the delays upon processing on a first admission to the MCC are excessive, and that this is such a grievous default in the critical time of initial confinement as to require correction by the court. The evidence on this subject is not persuasive that there are delays so unreasonably long as to justify the court's intervention.

■ 2. *Court visits.*—There are further complaints concerning delays in the short journey required from the MCC to this courthouse as well as other courts in the area for which MCC is a place of confinement. It is obvious that long waits in holding pens and similarly unpleasant places, following premature wake-up times and other oppressions, can interfere with an inmate's effective participation in his pending case, and may require judicial correction. *Alberti v. Sheriff of Harris County,* 406 F.Supp. 649, 663, 688 (S.D.Tex.1975); *Dillard v. Pitchess,* 399 F.Supp. 1225, 1237 (C.D.Cal.1975). In the present record, however, the court finds no credible evidence of undue delays reaching the level of constitutional or other wrongs. It is to be hoped and expected that respondents will make best efforts to see that inmates are brought to and from the court with all convenient speed. Particular judges, in the exercise of general powers of supervision and in the administration of their own cases, may find occasions to issue orders on this subject. The record does not support, however, the issuance of any general form of injunctive relief on this subject.

3. *Transfers.*—When this case began, inmates at the MCC awaiting assignment to more permanent places for the service of their sentences were frequently moved with harsh and inconsiderate abruptness. The practice was to post bus lists for such transfers in the evening preceding an early morning departure. The list was sometimes not posted until after the inmates had been locked into their rooms for the night. In either case, these notifications were so late that it often became impossible for an inmate to notify family, friends, or counsel before precipitate removal to a different institution, often a long distance away.

■ While this practice was not defensible, it failed somehow to be included in the ambitious list of grievances set forth in the original and amended petitions, and it came to be a subject of debate only during the course of the trial. When the undisputed facts were presented, and when the court gave informal intimations of a view adverse to respondents', the latter proceeded to make substantial revisions in their practices. It has now been declared by respondents that notice of a transfer will be given as soon as the designation has been made, and, in all events, at least 24 hours before transfer, except that notice may be withheld from an inmate (a) when there is reasonable cause to believe that it would present a serious threat to the safety and security of the bus or other means of transportation, (b) when population pressures compel a special, unscheduled bus run or other transfer, or (c) in situations where a present or impending emergency requires immediate transfer.

The revised policy seems adequate. Petitioners insist that if the policy is to be accepted at all, it should, nevertheless, be embodied in an injunction because it was not evolved until respondents were under the pressure of this lawsuit. Counterbalancing that contention is the tardiness of the submission of this issue. Balancing these equities, and relying on the good faith of the respondents, the court finds sufficient the rectification they have formulated

and will make no further orders on this subject.

## M. LANGUAGE

Petitioners charge that the MCC fails to provide adequate information and services for inmates who speak no English; the main emphasis is on inmates who speak or read only Spanish. The complaint in this aspect must fail as a matter of fact and law.

The evidence adduced on this subject was meager in the extreme. Supplementing the record made by the parties, the court ordered a survey of the language situation, during the trial, with particular reference to inmates of Hispanic origin. The survey, if not minutely accurate, serves adequately for its purposes. It showed that of the 521 inmates in the MCC at the time, 110 were of Spanish heritage. Of these, 20 spoke no English and 32 read no English. Five of the latter were also illiterate in Spanish.

Although approximately 24% of the MCC staff speaks Spanish, due to staffing patterns and the fact that inmates who do not speak English are not separately classified, non-English speaking inmates may be assigned to units on which none of the staff speaks their native tongue. The MCC handbook, "Guidelines for Inmates at the New York Metropolitan Correctional Center," is translated into Spanish and distributed to Spanish-speaking inmates, as are some Bureau of Prisons Policy Statements. In addition, since the commencement of this action, the institution has obtained the services of an interpreter to translate these Statements. Although bulletin board notices are occasionally posted in Spanish, it is not the institution's policy to translate such notes in all, or even most, instances.

Although precise figures are not available as to how many inmates are bilingual, the record and the court's knowledge support a finding that the number is substantial. At least for those who speak or read only Spanish, a translator is likely to be available almost all the time from among staff or fellow inmates. The situation is not ideal, to be sure. But it is sufficient to withstand the proposals of petitioners for revisions by the court.

Petitioners ask the court to order that all printed information provided by the prison to inmates or their visitors be translated into Spanish; that 15% of the books in the general library be Spanish; that the institution hire a Spanish-speaking law librarian; that a Spanish-speaking staff member be assigned to any living unit housing Spanish-speaking inmates; and that an interpreter be made available to any arriving inmate who speaks neither Spanish nor English within 24 hours of arrival to explain institution regulations. The interpreter would be required to visit the inmate at least every 72 hours and be available as problems arose.

The record provides no basis for any of the relief requested. No witness testified to any instance of prejudice, or even discomfort, because of language barriers. The library list shows a number of titles in Spanish; there is no showing as to why, or for whom, they have been insufficient. There is no evidence that Spanish-speaking staff members are not sufficiently available when it is necessary for staff to communicate with Spanish-speaking inmates. Nor is there any evidence of unmanageable difficulties between inmates for want of sufficient communications.

Without intimating that a filling of these gaps in the record might lead to any different result, the court will dismiss the complaints respecting language problems.

## N. GRIEVANCES

Pursuant to Bureau of Prisons Policy Statement No. 2001.6A(10–18–74), the MCC provides procedures for complaints by inmates and responses at ascending levels of the agency. Petitioners assail the prescribed procedures and the practice under them. They seek extensive judicial revisions.

In the first instance, an inmate may present a grievance informally to a member of his unit staff. An informal written complaint, known to all on the inside as a "cop-out," may be sent to the appropriate

staff officer. Then, there is a formal written complaint (an "Administrative Remedy Form" or "BP–9"), which requires a response from a staff member within 15 working days. The staff member's determination may be appealed, first to the Regional Office of the Bureau of Prisons, which has 20 working days to reply, and then to the General Counsel of the Bureau, who has 30 working days to reply.

In addition to these procedures, since April 1976, each unit in the MCC has had an inmate committee which meets for the purpose of bringing inmate complaints to the attention of the staff.

Petitioners contend that the stated procedures are constitutionally deficient in that there is no set time in which a staff member must respond to a cop-out (or, in fact, any requirement of an answer at all), and the answer need not be in writing. Should an inmate resort to the formal procedures, the entire process, including appeals, may take 55 working days, or some eleven weeks.

In addition to these difficulties, petitioners note that BP–9 forms are available only from a staff member, who may attempt to discourage the inmate from filing a grievance and propose to solve the problem informally; and it appears that on occasion staff members have in fact refused to give inmates the forms. There are also charges that some staff members have refused to accept BP–9 forms from inmates. Further, a copy of any BP–9 form filed by an inmate is placed in the inmate's central file, and is available to the Parole Commission and other authorities. This, it is argued, will have a chilling effect on inmates' use of the procedure. Petitioners also challenge the efficacy of the inmate committees. They charge, first, that the committee members are not particularly diligent in soliciting inmate expressions, and, second, that the staff fails to respond to the grievances raised at the meetings.

Building upon the record of expert and other evidence, petitioners seek a substantial catalogue of directives by the court to revise and improve MCC grievance procedures. Specifically, their requests for relief say:

"1. Written grievance procedures

"a. Access to grievance procedure forms should be unrestricted.

"b. All grievance procedure forms describing emergency problems should be answered in writing within 24 hours. All other grievance procedure forms should be answered in writing within three days. All appeals to the regional or national office should be answered in writing within seven days.

"c. No grievance procedure forms or notations as to grievances raised by an inmate should be entered into his central folder or otherwise made available to the parole board or any individual not directly involved in the resolution and response to the grievance.

"2. Elected inmate-staff committees should be established with a right of appeal to an outside individual or group with the power of binding arbitration.

"3. A permanent ombudsman position should be created, with authority to investigate inmate grievances and recommendations, to make suggestions for rule and policy changes, to publicize findings, and to make periodic reports to the Court and/or other interested persons.

"4. Inmates should be advised in advance of all proposed new rules and policies or changes in existing rules or policies and afforded an opportunity to comment on those proposals." [54]

■■■ If judgments of policy were for the court, we might institute some or all of the changes petitioners demand. But the court is compelled to conclude that there is neither constitutional nor statutory basis for any of these proposals. However desirable, a grievance procedure is not compulsory for prisons any more than it is in public school faculties, the staff of government agencies, or a host of other places where such devices

**54.** Id. 445.

have been installed. In the rapidly developing field of prison law and policy, the usually forward-looking federal establishment may move soon to follow examples petitioners cite. The court lacks power, however, to compel or accelerate movement of that nature.

There are suggestions in the record that the Bureau's own regulations have been disregarded by MCC personnel in the handling of grievances. But the evidence does not establish any pattern or practice of this nature. And there is no specific case now presented for relief on this score. Obviously, today's decision leaves open individual or even class claims that at some future time violations of applicable regulations are resulting in legal injury to the inmates.

In this case, however, the prayers with respect to grievance procedures must and will be denied.

## O. SANITATION

 Under this heading in their lengthy list of complaints, petitioners begin their Post-Trial Memorandum as follows:

"The record establishes that the food storage, kitchen, and housing and housing areas of MCC are, and have been, infested with vermin."[55]

The assertions on this subject go on to charge that the facility is heavily populated with mice, lice, and other non-humans. It is charged that the place is strewn with food and garbage; that cleaning utensils are frequently missing; that there is a constant lack of toilet paper and paper towels; that new inmates are given dirty blankets and mattresses on arrival; that washing machines are constantly in disrepair; and that there are other, similar outrages.

This is one among several subjects upon which petitioners have allowed themselves to be carried away. The court rejects their allegations as substantially without basis in the record. From repeated visits to the MCC and entirely credible testimony, the court finds that the responsible officials in charge and the entire staff of MCC are earnestly and successfully coping with the problems of keeping the institution clean and orderly. It is impossible, as everyone knows, to walk through a public building so densely populated without finding some litter and some objects where they do not belong. On the whole, however, it is clear that the MCC has a highly satisfactory program for maintaining cleanliness and good order, employing both the energies of paid staff and inmates to this vital end.

In sum, without tarrying further over the details, the complaints about sanitation will be dismissed in their entirety.[56]

## P. VENTILATION AND TEMPERATURE

 Since the MCC opened, there have been significant difficulties with the environmental control system. There is no dispute as to this. It is also undisputed that respondents have sought, and expended substantial amounts of federal funds, to remedy the problems. The system now appears to be operating in a reasonably satisfactory fashion.

Petitioners would have the respondents hire a contractor to inspect and make recommendations concerning the system. The court is not called upon to say whether this is a good idea. Suffice it to say there is no ground for ordering such action.

## Q. FURLOUGHS AND JOB INTERVIEWS

Under this heading petitioners complain of practices and omissions which are clearly within the sound discretion of respondent officials.

 It is urged that prisoners here on writs, who might have been eligible for furloughs under the standards of the pris-

---

**55.** Id. 171.

**56.** In the multiplicity of our headings and subheadings, the divisions of substantive topics may sometimes be arbitrary and capricious. Under another heading, "Food," the court is ordering measures relating to "Sanitation"— namely, the wearing of gloves and headgear by persons handling food.

 

ons whence they came, are not suitably classified so that they may have furloughs here. But furloughs are surely among the subjects most broadly confided to the judgments of prison officials. Furloughs for writ prisoners, brought here for special and limited purposes, would appear to present particular difficulties and anomalies. The short of the matter is that petitioners have adduced no significant evidence on this subject and have shown no legal basis for any relief.

■ Equally unsubstantial is the complaint about MCC's reservation and occasional exercise of the power to verify with a prospective employer the fact that a job interview has been scheduled for an inmate seeking a furlough for that purpose. Petitioners are correct, of course, in asserting that prospective employers may have their interest chilled by confirmatory calls of this nature. The record reveals, however, and the court's experience with this subject reflects, that the prison, parole, and probation personnel, habituated to collaborative efforts on this delicate problem, proceed with a good measure of care and circumspection. The residual power to make a direct check with the employer is a valid incident to respondents' duties. There is no justification for the proposed intrusion by the court.

### R. MEDICAL CARE—AN UNRESOLVED ISSUE

Despite the length of this decision and the large number of subjects covered, the case is incomplete in one respect. Petitioners have urged that medical care at the MCC is seriously inadequate. With the concurrence and cooperation of both sides, a medical panel was appointed to study this situation. The panel report was received later than had been expected—or, at least, hoped. Thereafter, unsuccessful efforts were made to resolve the medical issues by agreement. For these and other reasons, the record is incomplete on these issues. It has been agreed and arranged that the gap will be filled in an evidentiary hearing before a Magistrate, sitting as special master.[57]

In the meantime, the case has been pending for a long time, all questions other than those concerning medical care are ripe now for decision at this level, and there is a substantial likelihood that one or both sides will wish to appeal the many rulings now ready for review. There is no just reason to delay further either the entry of a final decree here or the beginning of appellate efforts.

Accordingly, counsel for petitioners will serve and file a proposed form of final decree. Respondents will serve and file objections to the proposed form and counterproposals to substitute for the portions deemed objectionable. These submissions and the court's final decree will be completed with all reasonable speed.

---

**57.** In visits to the MCC, the court toured and considered the medical and dental facilities, receiving some pertinent information from professional and other personnel. The enlightenment thus acquired may serve, of course, to supplement the Magistrate's report.